LLOYD BLESSING and E. J. PLUMB,

*Plaintiffs and Respondents,*

vs.

F. G. PITTMAN, d.b.a. PITTMAN
TRANSPORTATION COMPANY,

*Defendant and Appellant.*

(No. 2544; December 2nd, 1952; 251 Pac. (2d) 243.)

418

For the defendant and appellant the cause was submitted upon the brief and also oral argument of Edward E. Murane and R. R. Bostwick, both of Casper, Wyoming.

For the plaintiffs and respondents the cause was submitted upon the brief and also oral argument of Edward S. Halsey of Newcastle, Wyoming, and Robert A. Burgess of Casper, Wyoming.

## OPINION

BLUME, Chief Justice.

This case involves the well known "borrowed servant" doctrine. The plaintiff Blessing was the owner of a Chevrolet truck equipped for hauling animals. The plaintiff Plumb was the owner of some race horses in question herein. In the evening of August 16, 1948, after dark, the driver of the Chevrolet truck hauling the race horses was traveling westward along Thirteenth Street in the city of Casper. The street was dark and the driver of the Chevrolet truck was blinded by the glare of a car traveling eastward, so he ran into the back of a carnival or circus wagon, also called a trailer, loaded with carnival paraphernalia, belonging to the John R. Ward Shows which was standing still on the street and was without any lights. The trailer was being pulled or hauled by a truck belonging to the defendant Pittman. The driver was one Dennis Rush, who was in the general employ of Pittman. The truck and trailer had stopped in the street for the reason that

the hook-up between the truck and the trailer had become loose. The Chevrolet truck of Blessing was practically demolished and some of the race horses were so injured as to become practically worthless. The plaintiffs brought action against Pittman, doing business as the Pittman Transportation Company, for the damages to them thus caused. The defendant filed an answer denying liability and also an affirmative defense of contributory negligence. This affirmative defense has not been argued, and is waived. The case was tried to a jury. They returned the verdict of $2,000 in favor of Blessing and a verdict of $4,500 in favor of Plumb. The court reduced the amount due to Plumb to $3,245, to conform, as counsel for defendant say, to the maximum damages proven in the course of the trial. After the plaintiff had rested and again after all the evidence was in, the defendant moved for a directed verdict in his favor. Both motions were denied. The defendant also filed a motion for judgment in his favor notwithstanding the verdict of the jury. That motion, too, was overruled. Judgment on the verdict, with the amount reduced as above mentioned, was accordingly entered in favor of the plaintiffs and the defendant has appealed.

1. It is contended by counsel for appellant that Dennis Rush, who was in the general employ of Pittman, was, together with a truck, hired out to the Ward Shows and was controlled by its men, so that in the particular work done by Rush in hauling the carnival trailer, he was not in the employ of Pittman but the employee of the Ward Shows. They state among other things: "Appellant relinquished all control, direction and supervision of the trucks and their drivers to the John R. Ward Shows for the purpose of moving John R. Ward Shows' equipment from the Burlington Railroad Siding in Casper to the Central Wyoming Fair

Grounds * * * * Appellant's equipment was under the exclusive control and direction and supervision of the John R. Ward Shows * * * * Under the lease agreement, they (the drivers) were to work under the direction and supervision of the John R. Ward Shows' foreman. * * * * At all times in the movement from the railroad siding to the Fair Grounds and return, they were under the direction and control of the carnival people. There was no supervision of this move in the hands of the Appellant. The Appellant contracted to lease the trucks and drivers and to do whatever work was assigned to them under the direction of the lessee." Whether this contention is justified must be tested by the testimony in the case, which is comparatively meager, and is in substance as follows: Pittman was a trucking contractor. The carnival, circus or show people wanted four trucks to have their circus or carnival wagons, also called trailers, hauled from the siding of the depot of the Burlington Railroad Company in Casper to the Fair Grounds about a mile and a half west of Casper. Pittman was to furnish these trucks with driver and was to receive $7 per hour for the use thereof. One of these drivers was Dennis Rush, the one involved in the collision herein, who was in the general employ of Pittman before and "on or about" August 16, 1948, the day of the collision, and whom Pittman paid, according to Pittman's own testimony. The drivers were to report at the siding at the Burlington Depot to get these wagons or trailers. They did so. The carnival men told the drivers or gave signals as to what trailer was to be moved. These trailers were then hooked on to the trucks by the Ward Shows' men and were unhooked by the same men when the truck and trailer arrived at the Fair Grounds. On the trip there, the driver was accompanied by some the carnival men. One John Dalgarno testified that he was Pittman's foreman at the time—which was denied by Pittman

—and he was employed to keep the trucks rolling so that the drivers would not stop for coffee and "horse" around. He was paid for his services by the show people and he collected the amount due Pittman and turned the money over to him. Pittman knew of the collision herein within about half an hour and saw John Dalgarno, and the inference may be drawn that he told the latter to investigate the collision. In any event, Dalgarno took one of Pittman's trucks for the purpose of doing so. He further testified: "Q. And, as I understand your testimony on direct examination, Mr. Dalgarno, the control of the trucks and the drivers and even your control were under Mr. Ward or the Ward Shows or their foreman? A. That's right, they told us what to do and we done it. They (the Ward men) told the drivers where to take them (the trailers). Q. Did their control extend to how the trucks should be driven, what speed? A. No." The Pittman truck was equipped with all the lights required by statute. The trailer involved herein had no lights whatever.

The accident herein, as heretofore stated, happened after dark and no lights were on the carnival wagon or trailer of the John R. Ward Shows in question here. It is made a misdemeanor to drive or move such trailers without proper lights after dark. See §§ 60-601, 60-602, W.C.S. 1945. Dennis Rush, the driver of the truck which moved the trailer in question herein, violated that statute when he moved the trailer during the evening of August 16, 1948, and was personally liable for the damages proximately caused by reason thereof. And so was the owner of the Ward Shows, who permitted and asked the moving of the trailer in violation of the statute. So the question remaining herein is as to whether Pittman also was liable for the damages under the rule of respondeat superior by reason of the fact that Dennis Rush was in his employ-

ment. The subject is considered in 57 C.J.S. under Master and Servant, § 566; 60 C.J.S. under Motor Vehicles, § 436 (c) ; 35 Am. Jur. § 578, p. 1012; 5 Am. Jur. § 384-388, p. 722-25; a lengthy annotation is contained in 17 A.L.R. (2d) p. 1388 et seq. We considered the point to some extent in the case of Phelps v. Woodward Const. Co., 66 Wyo. 33, 204 P. (2d) 179. The case of Stockwell v. Morris, 46 Wyo. 1, 22 P. (2d) 189, does not involve the "borrowed servant" doctrine, and is not sufficiently in point herein.

It has been said that the law on the subject before us is chaotic and that respectable authority for almost any position can be found. Nepstad v. Lambert, Minn., 50 N.W. (2d) 614, 620. We think, however, that ever since the time of the decision in Quarman v. Burnett, 6 M. & W. 499, 151 English Reprint 509, decided in 1840, there has not been too much conflict in cases in which the facts were substantially those of the case at bar. The English case was decided before the advent of the motor vehicle, but as stated in Lowell v. Harris, 24 Cal. App. (2d) 70, 74 P. (2d) 551, 556: "There has been no change in the fundamental legal principle since the 'horse-and-buggy days' when a team was rented with its driver."

As a matter of public policy and economic requirements a master is liable for damages caused by the negligence of his servant within the scope of the latter's employment. See Stockwell v. Morris, supra. At the same time, it has long been recognized that a general employer may hire or loan his servant to another for some special service so that he may become the exclusive servant of such other for such special service. Restatement of the Laws of Agency, § 227. Whether that is true in a particular case depends on the circumstances. Most of the courts hold that the test is as to who controlls the servant, or rather who has the

right of control. However, the term is somewhat vague. As pointed out in Dippel v. Juliano, 152 Md. 694, 137 A. 514: "The only difficulty about the rule, and it is a real difficulty, is to determine what is meant by 'control' * * * * the difficulty arises in attempting to define the extent or degree of dominion necessary to constitute the 'control' which the borrower must have over a servant loaned to him before he becomes responsible for his acts." This difficulty has been pointed out in a number of other cases. Hence the Supreme Court of Montana, in the case of Devaney v. Lawler Corp., 101 Mont. 579, 56 P. (2d) 746, was not quite satisfied with the rule, and came to the conclusion that in the final analysis the test is: "In whose business was the servant engaged?", stating among other things: "It may be fairly said that every case presents facts peculiar to itself. Different factors and elements tending to show the power of control in the general or special employer are presented in practically every case dealing with the subject. This perhaps explains to a great extent the seeming inconsistency and conflict among the decided cases. In the final analysis, however, the authorities are pretty generally in accord upon the proposition that the really determinative and controlling question is: In whose business was the servant engaged? This fact stands out in many of the cases to which we have already referred. Numerous others to the same effect may be found in the comprehensive annotations on this subject in 42 A.L.R. 1416 et seq." Similar reasoning was used by the Court of Appeals of New York in Braxton v. Mendelson, 233 N. Y. 122, 135 N.E. 198, where the court stated: "The rule governing such cases is a simple one: Was the servant, whose negligence injured a third party, performing work for his master within the scope of his employment, or was he loaned by his master to another to do the latter's business? In the one case the general employer is liable for his torts.

In the other he is not. But while the rule is clear its application is often difficult. The true relationship between master and servant may be obscured by circumstances seemingly contradictory. Ordinarily no one fact is decisive. The payment of wages; the right to hire or discharge; the right to direct the servant where to go, and what to do; the custody or ownership of the tools and appliances he may use in his work; the business in which the master is engaged or that of him said to be a special employer—none of these things gives us an infallible test. At times any or all of them may be considered. The question remains: In whose business was the servant engaged at the time?" And see discussion or mention of this test in Owen v. St. Louis Spring Co., 175 Tenn. 543, 136 S.W. (2d) 498, Gaston v. Sharpe, 179 Tenn, 609, 168 S.W. (2d) 784, Haw v. Liberty Mut. Ins. Co., 180 Fed. (2d) 18.

However, the Supreme Court of Minnesota in the case of Nepstad v. Lambert, supra, (p. 620), said on this point: "In the main, courts have relied on two tests in determining when a worker becomes a loaned servant. The first of these is the 'whose business' test. It asks: At the time of the negligent act ,which employer's business was being done or furthered. The answer to this question names the responsible employer. The test is practically valueless where, as in the instant case, the general employer's business consists of furnishing men to perform work for the special employer, because by doing his job the worker is necessarily furthering and doing the business of both employers." See also 17 A.L.R. (2d) 1396; Benoit v. Hunt Tool Co., 219 La. 380, 53 So. (2d) 137, 140. In Gaston v. Sharpe, supra (p. 786), the court, referring to both of the foregoing tests stated that neither of them "has proven entirely adequate. Instead of being tests they are rather to be considered as factors in

reaching a conclusion as to where the responsibility lies for the servant's act." The author of an article in 38 Mich. Law Rev. 1222-1254, has sought to establish still another test, namely the "Scope of Business Test." The article is well worth reading. After all, in view of the fact that one for whom work is done by a negligent servant is, on grounds of public policy, required to pay the damages proximately caused by the latter, if the work is within the scope of his employment, it often becomes a delicate question when a servant has been loaned to another as to what party should be held responsible, and it is only by the exercise of common sense, and by our innate sense of justice and sound reason that the proper answer can be furnished. Even then, since man's reason and sense of justice is not infallible, diversity of opinions may lead to diversity of result in particular cases.

It would seem that in some cases at least, both of the tests mentioned by the courts might well be considered as factors in the case to determine as to which employer is responsible for the negligent act of the servant. Take the instant case. There is no question but that Pittman was engaged in the business of hiring out trucks for the purpose of hauling goods of others. He specifically undertook to haul the specific trailer in question here. Was the Ward Shows also engaged in the same business in the same sense as was Pittman? This is at least doubtful. Its property—the carnival wagons or trailers, containing carnival paraphernalia—seems to be transported from one town to another by railroad. So far as the record shows, the Ward Shows depends on truckers to haul its trailers from railroad stations to the grounds on which the circus or carnival is to be held. The "work" or "business" of so hauling the trailers with their paraphernalia is let out to a trucker. That is the situation at least in so far as

the record before us shows and should be taken into consideration in determining the liability for the negligence of Dennis Rush, the servant in the general employ of Pittman. Thus in Blakey v. Capanna, 349 Pa. 144, 36 A. (2d) 789, 791, in which state the test of control is generally applied, it appears that a truck with a driver was furnished by Pasquale Capanna to an Asphalt Company for the purpose of doing some hauling for the latter; the Asphalt Company determined where the truck was to go and the load it was to carry, but had nothing to do with the operation of the truck. It held that Pasquale Capanna and not the Asphalt Company was properly held liable for damages by reason of the injury caused by the negligence of the driver. The court in that case remarked: "The Asphalt Company was not in the business of hauling; that, however, was the business of Pasquale."

In the case of Thatcher v. Pierce, 281 Pa. 16, 125 A. 302, the general employer was, as in the case at bar, engaged in the business of hiring out trucks and furnishing a driver. He did so in the instant case. It was pointed out that the general employer could not control the work to be done; he had nothing to do with the time or place where the truck worked, the manner in which the load was received, the route over which it traveled, or its discharge unconnected with the mechanical working of the truck; all of these were subject to the absolute discretion and control of the lessee. However, the lessee did not attempt to interfere with how the truck should be driven or its mechanical operation. It may be accordingly noted that the case is a particularly pertinent case here. The Supreme Court, reversing the trial court in directing a verdict for the defendant, held the general employer could be held liable. The court said in part: "We are not ignoring the line of cases holding a master may lend or hire his

servant to another for a particular employment and not be liable for an accident while the servant is so employed by the person to whom he is hired or loaned. But this is not the law where it appears the injury was done by his servant while in the ordinary course of his original master's business. If one 'hires out' a horse and wagon, with a driver, to perform a certain service for another, the master is liable for any injury caused by reason of his servant's negligence in the course of his employment, to wit, driving the vehicle. * * * * Where one is engaged in the business of 'hiring out' trucks, and furnishing a driver as part of the hiring, when an accident happens in the course of that hiring the owner of the truck is liable in damages. The presumption is that if the injury happened while the driver was operating the truck, it was in the original master's business, as it occurred in doing the specific thing the driver was engaged by the owner to do, and to whom the driver was directly responsible." The presumption above mentioned is also stated and annotated in 37 L.R.A., p. 71, et seq. And see annotation in 17 A.L.R. (2d) 1394, 1395 and cases cited.

In the case of Pennsylvania Smelting & Refining Co. v. Duffin, 363 Pa. 564, 70 A. (2d) 270, 271, 272, the defendant, the general employer, was engaged in renting out cranes with operators, which he did in that particular case. He paid the operators. The court upheld a finding that the defendant was liable for damages on account of the negligence of one of his operators. All that the hirer did was to point out the job to be done. The court said in part: "Where one is engaged in the business of renting out trucks, automobiles, cranes, or any other machine, and furnishes a driver or operator as part of the hiring, there is a factual presumption that the operator remains in the employ of his original master, since he is engaged in

the very occupation for which he was originally so employed. * * * * It is wholly immaterial that defendant gave no instructions to his operator since the controlling question is merely as to his *right* to give instructions; it is obvious that no instructions are called for every time a crane is rented as to the manner in which it is to be operated. Nor did the fact that plaintiff's representative pointed out to the operator the work to be done and the place where it was to be performed militate in the slightest against the continuance of the relationship of employe and employer between the operator and the defendant. It would be absurd to suppose that a person hiring a truck, a car, or a machine of any kind, with its operator, would become the employer of the operator merely because of telling him what he wanted done."

In the case of Baltimore Transit Co .v. State, 184 Md. 250, 40 A. (2d) 678, 685, the court stated: "The cases resolve themselves into two general classes: (1) where the owner loans, or transfers on a gratuitous basis, his vehicle with driver; and (2) where, as part of his business, the owner hires them to another. The test under both classifications is to determine who had the power of 'direction and control.' " In that case a Mrs. Bauerinfieind was engaged in the business of hiring out trucks. She did so to the city, in the case at hand, on an hourly basis of $2 per hour for truck and driver to collect garbage and ashes. The driver was paid by her and she alone had the right to discharge him. The driver reported to the city each morning, and was then told by the foreman for the city what to do in accomplishing the general task of collecting and dumping the garbage and ashes. Mrs. Bauerinfeind testified that she never knew for what the city wanted the truck and driver. A judgment against her was upheld. The court stated that the pre-

sumption of law was that she was liable. The court referred in part to the case of Bentley, Shriver & Co. v. Edwards, 100 Md. 652, 60 A. 283, where under similar circumstances the driver of the general employer was held liable for the negligence of his servant.

In Tierney v. Correia, 123 Conn. 146, 193 A. 201, 203, it appears that the town of Canton was engaged in doing highway work. The defendant Meselli was in the business of renting out trucks, and the town hired one of his trucks with driver for some of the work at $2 per hour. The driver was in the general employment of Maselli, who paid his wages. A third party was injured by reason of the negligence of the driver. It appeared that the foreman for the town testified—a fact to be particularly noted in the case at bar—that the driver was under his orders and direction and that he told him what to do and where to go to get the gravel and where to deliver it, but gave him no instructions as to what loads to take or how he should operate the truck. The court, in holding that the owner of the truck was rightly found to be liable for the negligence of the driver, stated in part: "In cases such as this, the right to direct the driver of the truck where to go and what to do, which is a necessary incident to the performance of the work for which it was hired, may be entirely consistent with a conclusion that the driver remains under the direction and control of the original employer." The court cited a number of cases.

Similar holdings will be found in DiGregorio v. Berg, 359 Pa. 376, 59 A. (2d) 80; Driscoll v. Towle, 181 Mass. 416, 63 N.E. 922; Lowell v. Harris, 24 Cal. App. (2d) 70, 74 P. (2d) 551; Landis v. McCowan, 114 Colo. 355, 165 P. (2d) 180; Morris v. Trudo, 83 Vt. 44, 74 A. 387; Meyers v. Tri-State Automobile Co., 121 Minn. 68, 140 N.W. 184.

No cases to the contrary have been cited. The case of Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S. Ct. 252, 53 L.Ed. 480, relied on by appellant, is in full accord with the cases already cited.

In the case of Carroll v. Dane, 89 N.H. 233, 196 A. 626, the court held that the jury was justified in finding the general employer liable for negligence of his employee loaned to another where that employee testified that he was employed by the general employer. So much more should that be true where, as in the case at bar, Pittman, the general employer, testified that on the day of the accident, Dennis Rush, his driver, was in his employ and was paid by him. He did not in any way qualify his testimony or make a claim that Rush was not in his employ at the time of the collision involved herein.

The cases generally announce the rule, as heretofore shown, and as also stated in 57 C.J.S. 291, § 566, that liability of the general employer is not affected by the fact that directions are given to the driver by the hirer as to when and where to go and as to what shall be carried. In the case at bar, the route from the Burlington Depot to the Fair Grounds was presumably chosen by Dennis Rush, the driver, since the men of the carnival were strangers. At least it does not appear that they chose the route. John Dalgarno testified that he and the driver were under the control of the men of the Ward Shows. That was largely, if not wholly, a conclusion. See the Connecticut case of Tierney v. Correia, supra. There is no testimony in the record indicating that the carnival people in any way interferred with the operation of the truck, or exercised any control as to the method of handling it. All that the carnival people told the driver was to haul the trailer from the Burlington Depot to the Fair Grounds. To hook it up to the truck was a necessary incident to

the work undertaken by Pittman. Pittman paid the driver, and he alone had the right to hire and fire him in connection with the work done. Suppose that a householder wants to move his household goods from one residence to another; that he loads these goods on his own trailer, calls up a trucker to send his truck and driver to haul the trailer, filled with goods, to the new abode, agreeing to pay a specific compensation; that the trucker sends his truck and driver, whom he pays to haul the goods as requested, and on his way to the new abode the driver is negligent and injures a third party, and nothing more appears, can there be any doubt that the owner of the truck is liable for the damages caused? We think not, and that is nearly the situation in the case at bar.

One factor, however, distinguishes this case somewhat from all the many cases which we have examined, and after a most diligent search, we have not found any direct authority on that point. The negligence here consisted of moving the trailer when it had no lights in direct violation of our statute and the penal provisions thereof. Failure to observe statutory requirements has been held to be negligence per se. 60 C.J.S. § 263, p. 642. Neither the driver nor his master were privileged to move the trailer in that condition even though asked to do so by the Ward Shows' people. It was their duty to refrain from doing so. All of the parties involved are presumed to have had equal knowledge of the law. Whether or not Pittman personally knew of the absence of these lights does not appear. If he knew, he would, of course, be participant in the violation of the statute. Would it make any difference if he did not know? The point has not been argued, although it is the only point that might cast some doubt on the question before us. In the first place the presumption generally is, as already shown, that the serv-

ant remains in the employ of the general employer. So we are inclined to think that if the absence of knowledge on the part of Pittman makes any difference in determining his liability, the burden of proof of such absence of knowledge was in a case such as before us—we do not say generally—upon him. He has not met that burden. Aside from that, suppose that a railroad company transports game in direct violation of a legislative provision. If the game is packed in a closed package, so that the contents are not visible, then, it would seem, the railroad company should not be held liable for violating the legislative provision. Suppose, however, the game is in an open crate and the servants of the company accept and transport it, then, it would seem, the railroad company would be liable for the acts of its servants. By analogy this reasoning would seem to be applicable to the case at bar. The absence of lights on the trailer in question was visible and open for everyone to see. In Davis v. Boggs, 22 Ariz. 497, 199 P. 116, 121, it appears that a statute required a locomotive engineer, under penalty, to ring a bell under certain conditions. It was contended that the statute imposed no duty on the railroad company but only on the engineer. But the court stated: "We think the duty imposed by the statute extends to the company. We place this construction of the statute upon the broad and general principle that the master may fairly be held to be under obligations to see that his servants do not violate the criminal law in the operation of his equipment, * * * * " In Thompson, Commentaries on the Law of Negligence, Vol. 1, § 520, p. 483, the author states: "It is scarcely necessary to say that the rule of *respondeat superior* operates to charge the master, in the case where the act done by the servant is prohibited by *statute,* so as to become, under principles elsewhere discussed, negligence *per se,* as well as to cases where the act of the servant amounts

to negligence under the principles of the common law."
In 57 C.J.S. § 573, p. 322, it is stated: "It has gen-
erally been held that where the relation of master and
servant actually exists, under the respondeat superior
doctrine a master may be liable in damages because of
the criminal acts of his servant, where such acts can
be said to be within the scope of the servant's em-
ployment." As we have already seen, the jury had the
right to find that the exclusive control, if any control
at all, over the driver and his truck was not relin-
quished to the hirer in this case and such relinquish-
ment of exclusive control is necessary to relieve the
general employer from liability for the negligence of
the servant. 57 C.J.S. § 566, p. 291, note 46. And it
would seem further that the operation of the truck
with the trailer was within the scope of the driver's
employment in view of the fact that the master speci-
fically contracted to haul it. So we think that the want
of knowledge would not make any difference, at least
in so far as the jury had the right to find the general
employer liable herein. We must not be understood
as holding that liability for damages may be fastened
on the general employer in cases generally in which
the servant commits an illegal act at the request or
command of the hirer. No such broad question is be-
fore us.

2.   The court gave the following instructions to
the jury:

### "Instruction No. 11

"The Court instructs the jury that in order to de-
termine who is responsible for any unlawful acts of an
employee, it must be determined by whom such person
is employed. If a servant is loaned or, for a considera-
tion, is furnished by an employer to another person,
the question of who is liable for the servant's acts

generally depends upon which person has the right of direction and control and in whose business the servant was engaged while performing the act complained of. The responsibility for the servant is in the person who has direction and control over him. If both the original employer and the person to whom the servant is loaned or furnished have direction and control over the servant, then both may be responsible for his acts.

"In this case, plaintiffs, in order to recover from defendant, must establish by a preponderance of the evidence that the defendant had direction and control over the person whose negligence caused the accident complained of."

It is objected that the court used the expression "in whose business the servant was engaged" instead of the phrase whose work was being done. It appears, however, from what we have already stated that counsel are drawing too fine a line. A further objection is made to that part of the instruction which states that the original employer as well as the person to whom the servant is loaned might be responsible. That it may be true at times is stated in 57 C.J.S. 290. It may be that that part of the instruction was academic in this case. But it was harmless, and not a cause for reversal herein.

3. The jury allowed the plaintiff Blessing the sum of $2,000 for the damage to his truck. Counsel for appellant claim that this was not justified. Blessing testified that the value as of July 29, 1948, the last time that he saw it, was the sum of $2,000. It is objected that it was not shown what the value was as of August 16, 1948, the day of the accident. However, there is a presumption of continuance of established facts or condition. 31 C.J.S. 741. That rule should doubtless be applied with reasonable caution. But July 29 was not

very long before August 16, and the rule could reasonably be applied here. Blessing, the owner, counsel say, was not a competent witness as to the value of the truck. We have held otherwise in Shikany v. Salt Creek Transp. Co., 48 Wyo. 190, 210, 45 P. (2d) 645. The weight of his testimony was for the jury. It is also claimed that it was not shown that the "truck was a total loss." Counsel are in error. The witness Marvin E. Leach (Q. 630) stated: "The truck, I would say, was a total loss."

We find no reversible error in the record, and the judgment of the trial court is affirmed.

*Affirmed.*

RINER, *J.*, and ILSLEY, *J.*, concur.