Josephine LEONARD, Appellant,

v.

UNITED STATES of America, Appellee.

A. Joseph WILLIAMS, Administrator of the Estate of Cora Mae Leonard, deceased, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 5267, 5268.

United States Court of Appeals Tenth Circuit.

June 23, 1956.

consolidated for trial by the trial court, and the appeals are before us on a consolidated record. Both cases were brought against the United States, under the Federal Tort Claims Act, 28 U.S.C. A. §§ 1346(b) and 2671 et seq., the first seeking damages for personal injuries to Josephine Leonard, the second for damages for the death of Josephine Leonard's minor daughter, Cora Mae Leonard, said to be caused by the negligence of an agent, servant and employee of appellee, acting within the scope of his employment.

The accident, from which proximately flowed the injuries and death, resulted from a collision between the vehicle owned and operated by appellant Josephine Leonard, and a vehicle owned by the United States and operated by one Frederick S. Williams, then a Sergeant of the United States Air Force assigned to duty with the AFROTC Detachment at the University of Wyoming. The situs of the collision was U. S. Highway Number 30, which runs in an Easterly-Westerly direction between Laramie and Cheyenne, Wyoming. The collision occurred July 1, 1953.

The lower court rendered judgment for the United States of America on the theory, first, that the driver of the government vehicle was not acting within the scope of his employment at the time of the accident, and secondly, that the appellants are barred from recovery as a result of the application of the doctrine of contributory negligence. Inasmuch as our ruling as to the first point is dispositive of the case, we will not consider the questions of negligence and contributory negligence.

Teno Roncalio, Cheyenne, Wyo., for appellants.

John G. Laughlin, Atty., Dept. of Justice, Washington, D. C., for appellee.

Before BRATTON, Chief Judge, PHILLIPS, Circuit Judge, and ROGERS, District Judge.

ROGERS, District Judge.

The two causes here on appeal involve common questions of law and fact, were

The pertinent portions of applicable sections of the Federal Tort Claims Act, are as follows:

"Section 1346. United States as defendant

\* \* \* \* \* \*

"(b) Subject to the provisions of chapter 171 of this title, the district courts \* \* \* shall have exclusive jurisdiction of civil actions on

claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

\* \* \* \* \* \*

"Section 2674.  Liability of United States

"The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

\* \* \* \* \* \*

"Section 2671.  Definitions

"As used in this chapter and sections 1346(b) and 2401(b) of this title, the term—

\* \* \* \* \* \*

" 'Employee of the government' includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.

" 'Acting within the scope of his office or employment,' in the case of a member of the military or naval forces of the United States, means acting in line of duty."

It will be seen from reading the above statutes that liability on the United States, under the Federal Tort Claims Act can only be predicated when the negligence of a government employee occurs while "acting within the scope of his office or employment". Section 1346(b), supra.

In order to determine whether Sgt. Williams was acting within the scope of his office or employment, some detail in the recitation of the facts concerning his status, activities and movements at the time surrounding the accident, is required.

For some months preceding the accident, Williams was a member of the United States Air Force, and assigned to the Air Force ROTC Detachment at the University of Wyoming, in Laramie. His duties with the Air Force consisted, in the main, of administrative work at the Detachment, keeping the records of the students enrolled in ROTC work, performing some services as a Drill Sergeant, and in teaching of classes in Air Force administration and supply.  Permission, at times, was given enlisted personnel, including Williams, to use the Air Force vehicle to go to the Warren Air Force Base near Cheyenne, Wyoming, for supplies and for Post Exchange items, the latter being bought at the personal behest of other enlisted personnel.  In the month of May, 1953, Sgt. Williams submitted an application for Air Observer training.  This application was submitted to the Aviation Cadet Examining Board at Warren Air Force Base, Cheyenne.  A notice that such applications would be received was distributed through Air Force channels to various units, including that stationed at the University of Wyoming.  It is well, here, to state that general publicity to this activity was had through various civilian publications.  Applicants were by no means limited to military personnel, and civilians were invited to apply for this training.  The evidence indicates that the greater part of the applicants were civilians, rather than members of the Armed Forces.  Sgt. Williams was not ordered to apply for this training, but did so of his volition, having in mind the ultimate personal reward to him of a commission as an officer in the Air Force of the United States.  A physical examination was re-

quired in the course of processing Williams' application. Prior to the date of the accident, he had submitted himself voluntarily for such a physical examination at the Air Force Base. On June 23, 1953, Sgt. Williams received, through channels, a written notification that his application for Air Observer training had been returned from Lowry Air Force Base near Denver, Colorado, to Warren Air Force Base "for physical reasons". Williams was requested in that notification to return to the base at his convenience, to have these defects taken care of. On the date of the tragic accident, July 1, 1953, Sgt. Williams left Laramie, Wyoming, at about 7:00 o'clock in the morning, in a government-owned vehicle which was assigned to the Detachment, of which Williams was a member. He had the consent of his Commanding Officer to go that day to Cheyenne, and likewise had his Commanding Officer's consent to drive the vehicle in question. He went from Laramie to the hospital unit at the Warren Air Force Base, where he reported for and received an X-ray examination. This examination was concluded at approximately half past nine that morning. Williams thereupon went to the Recruiting Board at the Warren Air Force Base, and had a discussion with a Sergeant there, concerning his application. Following this conference, he went to the Base Post Exchange, drank a cup of coffee, purchased a pack of cigarettes and made enquiries of some civilian clerks in that establishment concerning some film for Williams' camera. Before leaving on this trip, Sgt. Williams had agreed with a fellow enlisted man that he would, in Cheyenne, pick up an AAA automobile insurance policy which was to be issued in favor of his fellow comrade in arms. The insurance agent informed Williams that the policy had not at that time been completed, and Sgt. Williams was asked to return to the office of the insurance agent at some time after lunch on that day. Williams thereupon went back to the Warren Air Force Base for lunch. Thereafter returning to Cheyenne at ap-

proximately 1:00 o'clock in the afternoon, he was again informed that the policy was not ready for delivery to him. He left the insurance office, returned once again to Warren Air Force Base, and returned to Cheyenne in the middle of the afternoon, where he at last received the policy. He decided to make a further trip to the Warren Air Force Base Post Exchange. At that time he purchased some Tee shirts, some hair oil and some other toilet articles, and eventually departed from the Warren Air Force Base for his home station at Laramie, between 4:30 and 5:00 o'clock that afternoon. The accident out of which these suits have grown, occurred at 5:45 p. m., at a point between 35 and 40 miles West of the City of Cheyenne.

The above recitation of facts, we believe, fairly states the circumstances pertaining to Williams' status and his actions on July 1st, 1953. They are in harmony with the Findings of Fact made by the trial court, and there is ample and substantial evidence to support these facts. We must now determine whether, under the above state of facts, Williams was acting within the scope of his office or employment at the time he is charged with having negligently caused the accident and ensuing injuries and death herein.

■ The question of whether the alleged negligent acts by a government employee occurred while said agent was acting within the scope of his office or employment is to be determined by the settled law relative to the doctrine of respondeat superior of the jurisdiction where the alleged negligent acts occurred. See Williams v. U. S., 350 U. S. 857, 76 S.Ct. 100. In that case certiorari had been granted to the Court of Appeals for the Ninth Circuit, 215 F.2d 800. The Ninth Circuit Court of Appeals has held that the Federal Law governed the rule of respondeat superior. In a brief per curiam opinion, the Supreme Court of the United States held, in effect, that the case was controlled by the California doctrine of respondeat superior, rather than by the body of Fed-

eral Law on that question. The decision of the Court of Appeals was thereupon vacated and remanded for further consideration and disposition in the light of the California doctrine.

In view of the Supreme Court's decision just mentioned, we must make enquiry to determine what has been decided by the Supreme Court of the State of Wyoming, relative to the law of respondeat superior. A search of that State's case law reveals that there is a dirth of authority on the question, but such cases as have been decided by the Supreme Court of Wyoming, are in harmony with the body of the Federal Case Law, and the general rules prevailing among the various States of our Union.

■ Summarizing the Wyoming law from a negative standpoint, we can state that no enunciation has been made by Wyoming courts, the effect of which is to impose a liability on a principal for the negligent acts of his agent occurring when the latter was in the furtherance of his personal business or to use the phrase of the learned trial court, on a "mission of his own". The doctrine of respondeat superior has received the specific attention of the Supreme Court of Wyoming in two cases, Stockwell v. Morris, 46 Wyo. 1, 22 P.2d 189, and Blessing v. Pittman, 70 Wyo. 416, 251 P.2d 243.

In the Stockwell case, one Morris was a salesman for the Maytag Intermountain Company. He was driving his own personal automobile from Hudson to Lander, Wyoming, and collided with the automobile of the plaintiff. Morris had worked on a commission for the Maytag Company, made his own schedules for his salesmanship activities, came and went as he pleased, made certain adjustments and repairs to the washing machines and himself worked out the details of his customer relationships. The Wyoming court, in affirming an order of the trial court granting a directed verdict to the defendant Maytag Intermountain Company, went with meticulous and thorough detail into the law of agency, as it applies to torts, spe-cifically recognized the general rules of respondeat superior and formulated a lodestar for Wyoming jurisprudence in this regard. In effect, that court held that it is the modern doctrine that a master is responsible for the torts of his servant, committed within the scope of his employment. It then went on to state that there are many cases in which a man should not be held responsible for the acts of a representative, if the latter is not under his immediate control, direction or supervision. This discussion was crystallized with the ultimate ruling that if the right of control is the test, then it ought to be directed to that portion of the employment directly connected with the factor by reason of which liability is sought to be enforced.

The last case on this problem, Blessing, supra, involved an action for damages to a truck and the horses being transported therein, from a collision with the rear of an unlighted circus wagon being hauled on a Wyoming highway at night, without those lights which are required by Wyoming statute. There the truck was owned by the defendant, and operated by the driver-servant who was otherwise in the general employment of the defendant. Inasmuch as circuses are, by their nature, nomadic in nature, the circus was no doubt out of the jurisdiction of Wyoming at the time suit was brought. The plaintiff thereupon sought damages from the truck owner who was hired by the circus to transport the latter's vehicles to the site for the performance of the following day. The Supreme Court held that under the circumstances shown, the driver of the truck was in the general employ of the defendant, rather than being the special servant of the circus operator, and that therefore the defendant was liable for the driver's negligence. While this case dealt specifically with the "borrowed servant doctrine", the general law of respondeat superior was discussed and the Stockwell case was cited. The two tests applied by the Wyoming court in the Blessing case was,

first, who had control over the servant, and secondly, in whose business was the servant engaged at the time of the accident. Emphasizing the latter test, the court held that the servant was engaged in the transportation of goods and vehicles by motor vehicle on the highways, and that this was the activity of his master, the defendant Pittman.

The scope of the office or employment of Sgt. Williams was that of a non-commissioned officer in the Air Force ROTC Detachment, assigned to the University of Wyoming. His duties, as stated above, were administrative and of a training nature. Any other activities of Williams would have to be performed as additional specific duties following an order of his Commanding Officer. The record in this case is entirely devoid of any evidence indicating an order or an instruction given Williams by his superior officers or his Commanding Officer, requiring Williams to purchase goods at the Post Exchange, or to pick up the automobile collision and liability policy for his fellow enlisted man. The evidence is uncontradicted that any steps taken by Williams regarding Air Observer training, and including the making of his application, the taking of his original physical examination, and likewise going to the Warren Air Force Base for further examinations of a physical nature, were entirely voluntary on the part of Williams, and were done for that individual's own personal convenience and advancement in the military field. The notification to Williams that his application had been returned from Lowry Base to the Warren Base was informative, only, and contained a request, not an order, that Williams should, at his convenience, go to the Warren Air Force Base Hospital for a further examination and treatment. As has been stated in another part of this opinion, the Air Observer program was made available alike to military and civilian personnel, was possibly emphasized to the latter category. It cannot be said by the application of any process of logical reason, that Sgt. Fred S. Williams made the trip from Laramie to Warren Air Force Base in response to an order of the military establishment, or in the course of the scope of his employment. Some seven and a half or eight hours of July 1st, 1953, between the termination of his physical examination at the Warren Air Force Base and the time of his departing for Laramie, were spent either in leisure, or in the pursuance of private and personal objectives of Williams. His original objective, that of securing further medical examination being voluntary on the part of Williams, and the balance of his activities being purely of a personal nature, it cannot be said that, at the time of the accident, or at any time while Williams was on the trip in question, he was acting within the scope of his office or employment. Being so engaged on a personal mission, or a mission of his own on the day and time in question, the United States of America cannot be liable to either of the appellants herein, under the well-known doctrine of respondeat superior.

Accordingly, the judgments of the lower court are

Affirmed.