ROCKY MOUNTAIN TRUCKING COMPANY, A WYOMING CORPORATION, AND ROBERT JORDAN,

*Appellants,*

(Defendants below)

vs.

DONALD DEAN TAYLOR

*Appellee,*

( Plaintiff below)

(No. 2855; February 17, 1959; 335 Pac. (2d) 448)

462

464

466

For the appellants, the cause was submitted upon the brief of William S. Bon of Swanton & Bon and Robert J. Murphy of Mahoney, Murphy & Emery of Casper, Wyoming, and oral argument by Mr. Bon.

For the appellee, the cause was submitted upon the brief of Robert R. Rose, Jr. and Arthur F. Fisher of Rose and Rose of Casper, Wyoming, and oral argument by Mr. Rose.

Heard before Blume, C. J. and Parker and Harnsberger, JJ.

468

## OPINION

Mr. Justice Harnsberger delivered the opinion of the court.

The plaintiff below was given a $25,913.35 judg-

ment, with costs against defendants, as damages for injuries he sustained when a large metal tank, which was being lifted by a winch operated by defendant Jordan, was suddenly lowered crushing plaintiff's hand. A jury awarded plaintiff $35,046.05, but the court reduced this to $25,913.35, and the defendants appeal.

The facts relied upon to establish defendants' liability are not disputed but the sufficiency of that evidence is challenged. In addition, appellants claim error because: (1) Evidence of negligence not pleaded was admitted; (2) defendants' motions for directed verdict, to set aside the judgment and for judgment notwithstanding the verdict were overruled, which motions were based upon the alleged insufficiency of plaintiff's evidence, his contributory negligence and assumption of risk; (3) certain medical testimony was improperly admitted; (4) the award was excessive; (5) certain instructions were given or refused; and (6) a new trial was denied.

From the evidence it is clear that as it had done on previous occasions, the Fitzpatrick Drilling Company employed the Rocky Mountain Trucking Company to move one of its drilling rigs. This included moving the tank, to which reference has been made, to a new location and leveling it. In performing that service it was customary that some of the services of the trucking company be performed at the direction of the drilling company's driller. In consequence, the trucking company's employee Jordan responded to the driller's direction and used the trucking company's truck equipped with "gin poles" and a winch to raise the tank about 18 inches so that leveling boards could be placed beneath it. To do this Jordan backed the truck up to the tank; the drilling company's employ-

ees hooked the winchline onto the tank and Jordan operated the mechanism which lifted the tank. The plaintiff was employed by the drilling company as a "roughneck" and his duties required him to do anything the driller told him to do. Plaintiff testified he had helped hook the winchline onto the tank when he received instruction from the driller to get blocking and put it underneath the tank; that he went to get the blocking and when he returned the tank had been raised about 12 inches; that he kneeled down to place a 2" x 4" board about 2 to 4 feet long underneath the tank; that this required him to place his hand beneath the raised tank in order to smooth out some dirt clods and rough spots when within 30 or 40 seconds, without any warning, the tank dropped on his hand. Although Jordan knew that his raising the tank with the winch was to permit someone to put boards beneath it, he carelessly dropped or suddenly lowered the tank without first ascertaining, or even attempting to ascertain, whether whoever was placing the leveling boards was in the clear and beyond danger. This evidence was sufficient to establish the liability of both defendants.

In an attempt to establish the contributory negligence of plaintiff and his assumption of risk, defendants introduced what purports to be the expert opinion testimony of a driller that plaintiff need not have placed his hand underneath the tank. Even if we were to concede such opinion was properly received as being acceptable expert testimony, when it is remembered that it was given in answer to a question which did not describe all the conditions under which the blocking was to be done, and that the jury had before it the plaintiff's own testimony which, if believed, indicated the reasonable necessity of plaintiff doing his job in the manner in which he did, the pres-

ence of the contributory negligence relied upon rested solely with the determination of the jury. That it obviously elected to accept the plaintiff's version rather than the so-called "expert's" opinion, which was expressed without taking into consideration all the facts, was its right and privilege and is beyond criticism.

As is somewhat fully discussed under the title "Assumption of Risk" in 56 C.J.S. Master and Servant § 357, commencing at page 1148, the defenses of assumption of risk and contributory negligence are so closely allied that courts have experienced considerable difficulty in attempting to draw a maintainable line of distinction between them. Different courts have said it lies in degree rather than in kind; that the point of difference occurs where the danger is so obvious and imminent that no one of ordinary prudence would encounter it; that the one is based in contract and the other in tort; that contributory negligence involves some fault or breach of duty on the employee's part while assumption of risk may exist independent of any employee negligence; and many other points of more or less fine distinctions are suggested. We do not propose or deem it necessary to add our own concept of what distinguishes the one from the other nor do we specifically adopt as our own any one of the distinctions announced by other courts. We content ourselves by saying that the acceptance by a worker of employment in such an extrahazardous employment as that entailed in oil-field work does not serve to exonerate an employer from liability for negligent acts, whether such acts be those of the employer or of the employer's servant. This, we think, adversely disposes of the assumption of risk defense.

We might also add that appellants' suggestion that

the action of Jordan, in suddenly and without warning lowering the tank while he knew the leveling operation was in progress and without his being apprised in some manner that it was safe to do so and would not endanger those who were assisting in the work, was not negligent because it was in accordance with customary practice cannot be accepted. An operational practice, although long indulged in, but which does not afford reasonable protection for those engaged in that operation, does not relieve from liability those responsible if it results in negligently causing injury or damage.

Appellants' claim that evidence was improperly admitted of a type of negligence not pleaded is not justified by the record. It is insisted that evidence, tending to show Jordan failed to keep a proper lookout, wait for instructions or to ascertain whether it was clear to lower the tank, was improperly received because it was not within the specific acts of negligence pleaded. While the rule in this State is not as unqualified as that contended for here, and is subject to certain exceptions, all we need say to dispose of the point is that plaintiff's allegation that defendant failed "to properly control and operate the winch" was sufficiently broad to admit the criticized evidence.

What we have said moves us to reject appellants' claim that their several motions were erroneously overruled.

Appellants next say there was error in allowing plaintiff's doctor-witness to testify in terms of percentage of loss of plaintiff's hand and more especially his stating the percentage of permanent partial disability suffered by plaintiff as a result of the injury to that member. We are then referred to "20 Am.Jur.

p. 650". We find nothing in this text to give comfort to the appellants. On the other hand, in the same work in 20 Am.Jur., Evidence, § 862, pp. 723, 724, it is stated a physician may give his opinion as to the general effect of an injury upon the body, and the duration, permanency, and extent to which an injury will affect a person's ability to perform labor, as well as noting that such medical experts may in so testifying refer to medical writers as the doctor did in this case. Also in 32 C.J.S. Evidence § 534, pp. 245, 246, substantially the same statements are made and what is said in both of these works is amply supported by the cases and authorities cited, many of which expressly give approval where the doctor voices his opinion as to the degree or extent of disability in terms of percentage. See also Cropper v. Titanium Pigment Co., 8 Cir., 47 F.2d 1038, 1043, 1044, 78 A.L.R. 737, 745, 746, in which the court quotes with favor Mr. Justice Van Devanter's pronouncement in U. S. Smelting Co. v. Parry, 8 Cir., 166 F. 407, 92 C.C.A. 159. This statement lucidly and forcefully explains why such evidence is admissible and why it does not usurp the province of the jury but is accepted to aid them in performing their function.

The only case cited by appellants in support of their position that even an expert witness may not testify in terms of percentage as to the loss of a claimant's body as a whole is Pocahontas Mining Co. v. Industrial Commission, 301 Ill. 462, 134 N.E. 160, 163. We find it difficult to understand that court's reasoning when it says in one breath that it is proper for an expert to testify to the amount or extent of a disability and in the next says the witness cannot answer in direct terms as to what percentage of loss he has sustained. Such a statement is certainly not persuasive. The argument of appellants that testimony of per-

centage of disability is a usurpation of the province of the jury is sufficiently answered by the statement of Mr. Justice Van Devanter, supra, heretofore referred to.

In any event the question seems to have been settled adversely to appellants' position by the decision of this court in Sakamoto v. Kemmerer Coal Co., 36 Wyo. 325, 332, 255 P. 356, 358, where approval was given to the language used in McDonald v. City Electric Ry. Co., 144 Mich. 379, 108 N.W. 85, in saying it was competent to prove by an expert the degree of impairment a claimant suffered as the result of injury. The expert witness in the Michigan case had testified that the claimant's ability to perform manual labor had been reduced fully three-quarters. We see no material difference in permitting a witness to testify that the disability was three-quarters or was 75 per cent. Again in Carter Oil Co. v. Gibson, 34 Wyo. 53, 56, 57, 241 P. 219, 220, this court seemed content to accept without question a medical expert witness' testimony which expressed the degree and extent of disability suffered in terms of percentage.

It is also urged by counsel that the testimony of the doctor was improperly admitted because no proper foundation was laid to receive such testimony, that it was based upon possibilities and that it was purely conjectural. Qualifying the witness as an orthopedic physician and surgeon admitted to practice as such in this State was sufficient foundation to justify his giving testimony as an expert in such matters as the extent of permanent disability suffered as a result of the type of injury which was sustained. This is especially true when, as in this case, defendants elected not to explore the measure of his qualifications by cross-examination, and also because the matter of his

qualifications rested in the sound discretion of the court, which discretion we do not feel was abused. Certainly, in the absence of anything shown to the contrary, the court was privileged to favorably pass upon those qualifications.

As to the charge that the testimony dealt with possibilities rather than probabilities, that is completely refuted both by the questions asked and the answers given. For the most part the doctor stated what he believed or what he said were the probabilities. In fact the authorities cited by appellants tend to approve rather than disapprove of the testimony given in this case. See Calder v. Levi, 168 Md. 260, 177 A. 392; 97 A.L.R. 880; 32 C.J.S. Evidence § 534, p. 251; 20 Am. Jur., Evidence, § 863, p. 725.

We also do not agree that the statement of what a qualified medical expert believes or says is probable may correctly be described as conjecture, at least in a legal sense. Everything which is not in being has some aspect of conjecture. In the affairs of men we have come to accept as sufficiently reliable for us to act upon the considered belief and judgment of those whose study, training and experience lend their opinions and beliefs to our acceptance.

But appellants say even a medical expert should not be asked the following question:

"Will you please state to the Court and jury whether or not in your opinion the patient, Mr. Taylor, will suffer in the future from the injury to his hand which he received in April of 1957?"

Again objection was made there was no proper foundation, notwithstanding there was ample evidence of the doctor's qualification as a practicing physician

and surgeon in this State and a showing had been made that he had specialized in the treatment of the type of injury sustained by plaintiff. Furthermore, without any previous objection from defendants, the doctor had been permitted to testify voluminously as such an expert. Another objection was made that this question was also based upon possibilities and was purely conjectural. The witness' answer removes any doubt as to its propriety, because the doctor proceeded to state what he believed:

"I believe that the patient will continue to have some difficulty because of the marked atrophy of his hand, particularly in cold weather, or if he happens to hit a hard object the soft tissues are destroyed enough that the skin is fairly adherent to the bone in several areas and may break the skin open, possibly developing an infection, and with the limitation of motion if he continues to have severe pain, is unable to use the hand, it may be necessary in the future to do an amputation at or above the wrist and have an artificial prosthesis."

A belief entertained by an expert is a positive opinion about which he is entitled to testify. His belief is not a statement of mere possibility unless the witness so qualifies it. Neither is it to be taken as conjecture. It is true the doctor ended his answer by pointing out that if pain continued so as to prevent use of the hand it might be necessary to amputate. This portion of the answer was possibly subject to a motion to strike, but no such motion was made. In any event, the inclusion of the reference to amputation is not sufficient reason to reverse the case, and this is certainly true when defendants' own medical witness made almost the same identical statement when testifying under direct examination.

The claim of excessive damages is made notwithstanding the court made a reduction of over $9,000

from the jury's award. It is said the sum of $15,954.84 must have been included in the $25,913.35 judgment as the award for permanent partial disability and this was too much because in order to arrive at that sum the court must have "erroneously assumed that because there was 35 per cent disability of the body as a whole", the plaintiff's earning capacity was impaired 35 per cent.

Now that we have decided the testimony of the medical expert as to the extent or degree of disability suffered may be expressed in percentages, it is only necessary to determine whether that percentage was properly applied to arrive at the award for permanent partial disability which was made.

The record discloses that in addition to medical testimony that plaintiff had suffered a 30 to 35 per cent disability there was also evidence as to plaintiff's occupation at the time of injury and that evaluations of disabilities within his classification were taken into consideration in conformance with a text, the standing of which as an authority on the subject, was not attacked in any way. Testimony as to the nature and extent of the injury was not disputed and defendants' own medical witness gave testimony as to the extent of permanent partial disability suffered by plaintiff which in itself seems to justify the award. It was as follows:

"Q. The condition of the hand?

"A. The condition of this man's right major hand as of the 29th of November was that, in my opinion, he had suffered a permanent partial disability of that hand that the time element, however, since injury and now is not adequate to say that this hand is stationary. It may get worse, it may get better. Exactly, I think,

and most authorities will agree, that ten months to a year before you estimate how this thing is going to come out, following this kind of injury, at his age. He complains and has a right to complain of a tender, sore index finger. He has complaints of change in temperature which go with this. He has suffered a loss of the middle finger, which has been removed just above the head of the joint. The index finger is fixed in a position about like that (indicating). As I remember, it has been amputated, so he has lost that, and it's fixed like that (holding hand up). This is the one that is gone, this one comes over like this. Thumb movements are good. Power and range of motion in the thumb are good. The fifth finger, power and range of motion are good in that, but in the palm of the hand, which is one of the biggest factors in a useful hand, there is beginning, just like there has developed well in the first and ring finger a contracture of the tendons that probably will be progressive. Does this include recommendation as to—

\* \* \*

"Q. Doctor, at this time is any further—in your opinion, is any further treatment indicated?

"A. I believe there are two types of treatment that should be recommended to the patient for his decision. First, is an amputation below the heads of the index, the middle and the ring finger. The middle finger is gone, and the other two remnants are painful, as he says, and they should be. They are fixed in a position that they are of no value. Second, if he elected it, and some surgeon of repute were to attempt it, would be the freeing of the tendons of the remnants of the index and the ring finger, with a possible transplantation over and freeing of these palmer adhesions which are starting.

\* \* \*

"Q. Did you test the grip of the patient?

"A. The grip of this patient's right hand is not—no

matter what you use—will not be the true grip because of the subjective symptoms of pain in these remaining fingers. He can't use what he has because of pain.

\* \* \*

"Q. Now, what was the remedial surgery you were saying?

"A. As to that, depending on the rehabilitation, how he came along with that, it would depend a lot on his mental capacity to re-educate himself to use that hand which is not, where it never can be as good as it was before."

It appears to our satisfaction that the district judge gave most careful thought to this matter and carefully explained his method of computation. This was to adopt, as justified by evidence, the pleaded sum of $1,600 for loss of wages, $446 for hospital expenses, $5,000 for pain and suffering, $2,750 for disfigurement, $162.50 for the proved medical expenses, and $15,954.85 for proved permanent partial disability—a total sum of $25,913.35, the amount for which judgment was rendered. It is the court's allowance of $15,954.85 that inspires the appellants' serious claim that the judgment was excessive. Without going into too much detail regarding the computation which moved the court to arrive at this figure as a just amount within the evidence, we note that the learned judge accepted as the percentage, to be applied to arrive at the extent of partial permanent disability suffered by plaintiff, the mean between the 30 to 35 per cent of such disability indicated by medical evidence. In other words, the judge used 32½ per cent. The court also gave due consideration to the present value of the dollar, the take-home-averaged-earned dollar of the plaintiff during a normal work week, as

well as income tax deductions from earned income, and applied the accepted percentage of earning-power loss to the net income so computed over the period of plaintiff's life expectancy. We find each of the factors so used to be justified. In addition, the court rejected any allowance for claimed shock or nervous damage, which items of damage were not deemed to be sustained by sufficient evidence.

Even admitting that different minds might respond somewhat differently to the evidence in the record with respect to certain of the conclusions reached, we cannot say that the determinations made by the court were unsupported by any substantial evidence.

Appellants' claim that the trucking company was not liable, because Jordan lifted the tank at the direction of the driller and therefore the "borrowed servant doctrine" applies, is so allied with appellants' argument that one of their instructions was refused and another instruction was given that it seems logical to discuss these three points together. There is no dispute about the trucking company's being employed by the drilling company to move its drilling rig including the tank, and that this entailed leveling the tank at its new location. Raising the tank to place boards beneath it seems to have been the accepted way to level it, and as was usual the driller told the winch operator to lift the tank when the time came to level the tank and also told plaintiff to get boards to place beneath it. Under this state of facts, appellants say Jordan became the borrowed servant of the drilling company and insist "the test of the employer's control must be directed to that portion of the employment directly connected with the factor, whereby liability is sought to be established, which in the instant case is the leveling of the mud tank or narrowing it further, the lowering

of the mud tank". Of course to take appellants' statement literally would leave no question of borrowing at all, because lowering the tank was not done at anyone's direction but was the sole act of Jordan. We are not inclined to dispose of the point upon such a narrow view. We feel, however, that the holding of this court in Phelps v. Woodward Const. Co., 66 Wyo. 33, 52, 53, 204 P.2d 179, 186, which accepted the rule stated in 57 C.J.S. Master and Servant § 566, pp. 287, 288, when applied to the instant case, clearly requires the conclusion that Jordan was not a servant borrowed by the drilling company, but was at all times the servant of the trucking company. The controlling portion of the rule is:

"A servant of one employer does not become the servant of another for whom the work is performed merely because the latter points out to the servant the work to be done, or supervises the performance thereof, or designates the place and time for such performance, or gives the servant signals calling him into activity, or gives him directions as to the details of the work and the manner of doing it, or because the servants of the person for whom the work is being performed' assist in the work."

See also Blessing v. Pittman, 70 Wyo. 416, 425 et seq., 251 P.2d 243, 245 et seq.

The appellants say it was error to refuse giving the following instruction concerning Jordan's service:

"The Court instructs the jury that in order to determine who is responsible for any negligent acts of an employee, it must be determined by whom such person is employed at the time of the act. If a servant or employee is loaned or, for a consideration, is furnished by an employer to another person, the question of who is liable for the employee's acts generally depends upon which person has the right of direction and con-

trol and whose work was being done while performing the act complain (sic) of. The responsibility for the servant or employee is in the person who has direction and control over him.

"In this case, plaintiff, in order to recover from the defendant Rocky Mountain Trucking Company, must establish by a preponderance of the evidence that the defendant had direction and control over the person whose negligence caused the accident complained of."

We agree with the trial court's ruling, because the refused instruction would have required the jury to pass upon a question which under the undisputed evidence had become a matter of law in this State by the decision of the Phelps case, supra.

The following is the criticized instruction which was given:

"You are instructed that if you find from a preponderance of the evidence that the defendant, Rocky Mountain Trucking Company, was engaged in the lifting of a mud tank for the Fitzpatrick Drilling Company, and using in such operation a winch situated on the truck generally described as an (sic) Diamond T and that such winch was at the time of the plaintiff's accident being operated by Robert Jordan, a defendant herein, and if you further find from a preponderance of the evidence that the said Robert Jordan was negligent, then the negligence of such driver was the negligence of the defendant, Rocky Mountain Trucking Company."

This correctly advised the jury as to what findings it must make in order to establish the negligence of the trucking company defendant. We, therefore, overrule appellants' contentions respecting these instructions.

Two other instructions which were given are said to be erroneous because they allowed the jury to

consider impairment of plaintiff's earning capacity as an item of damage. Appellants claim this was error because such impairment was not pleaded nor was motion made to amend so as to include that item; that no competent evidence authorized any such finding and it wrongly assumed that a 35 per cent disability would impair earning capacity by 35 per cent.

It seems somewhat incongruous that after objecting to medical expert testimony on extent or degree of disability appellants here suggest there is such a fatal absence in pleading or evidence of loss of earning capacity that instructions are erroneous which tell the jury it may take into consideration such loss of earning capacity. It is mere quibbling to say that a physical disability of a person who the evidence shows earned his livelihood by manual labor is not evidence of loss of earning capacity, and the same is true when it is claimed that an allegation of permanent partial disability will not encompass a loss of earning ability under the same circumstances. This amounts to appellants saying evidence bearing upon degree of permanent partial disability cannot be admitted, yet an award of damages for loss of capacity to earn a living cannot be made unless there is such evidence.

Neither of the instructions referred to by appellants made any reference to a 35 per cent disability or a 35 per cent impairment of earning capacity as is suggested by appellants' objection. One of these instructions told the jury that if it found for plaintiff it should take into consideration all the facts and circumstances proved by evidence, the nature and extent of injuries, the suffering, the permanent disability, if any, the loss of time and inability to work, and plaintiff's impairment, if any, in earning capacity, in making its determination of any award of damages.

The other instructed that if it found plaintiff's ability to earn money was impaired, an amount should be awarded to reasonably compensate him for such loss. The medical testimony which reduced the extent of permanent physical disability to percentage terms was equally acceptable to inform the jury as to the doctor's opinion on the question as to how greatly it affected the plaintiff's earning capacity, when the jury also had before it evidence which showed the direct relationship of plaintiff's physical condition to the type of work for which he was fitted at the time of the injury. In consequence, these instructions were proper and we overrule the appellants' objections thereto.

In addition to those numerous other grounds advanced in support of defendants' motion for new trial, all of which have been heretofore disposed of, appellants say:

"After the jury had retired to the jury room and while they were still engaged in the determination of the case, they asked for and received a dictionary from the bailiff, with no notice to or knowledge of the Court of (sic) counsel for either party. The jury used the dictionary to look up the definition of words such as 'proximate', 'negligence' and others unknown. It is the firm contention of the defendants that the unauthorized use of such a book was completely improper and prejudicial, depriving defendants of a fair trial and constituting an illegal invasion of the sanctuary of the jury through the use of extraneous and incompetent evidence of such a character as would tend to improperly influence the jury."

We have no hesitancy in saying that the jury's requesting the dictionary of the bailiff, the bailiff's procuring of the dictionary, and the jury's use of the same was highly improper and is censured. As to whether a proper or sufficient showing was made to require the court to grant a new trial is another question. Defendants submitted the affidavit of one of the bailiffs

in charge of the jury in support of this ground of the motion for new trial. This sets forth "that after the jury had retired to deliberate the case in the jury room, and while they were still deliberating, they asked for and received a Webster's Standard Dictionary." It also avers "that she does not know of her own knowledge what use was made of the dictionary by the jury, and that to her knowledge permission was not obtained from counsel on either side or from the Court prior to the delivery of the dictionary to the jury". Another affidavit tendered in support of the motion was made by one of counsel for defendants who assumes to set forth at some length what two jurors had purportedly told him. Of course this latter affidavit was pure hearsay and should not be, and evidently was not, given the least consideration by the court. Thus it appears that the only fact to be considered when the motion for new trial was passed upon was that the jury had asked for and had received a Webster's Standard Dictionary. As was noted in a memorandum of the trial court, in Gustavenson v. State, 10 Wyo. 300, 68 P. 1006, where the jury had obtained and used the statutes of this State, it was the opinion of this court that that fact would not of itself be sufficient reason to set aside the verdict where it was sustained by the evidence. We agree with the trial court that the situation here is analogous and that in the present case the verdict of the jury is amply sustained by the evidence, and that the misconduct of the jury in asking for and receiving the dictionary, while grave, was not prejudicial to the rights of the appellants herein.

Having found adversely to the several claims set forth by appellants as reasons for reversal, we affirm the judgment of the lower court.

Affirmed.