GENERAL MOTORS CORPORATION ET AL. *V.*
LYNDA S. WERNSING ET AL.

[No. 808, September Term, 1982.]

*Decided March 3, 1983.*

The cause was argued before GILBERT, C. J., and WILNER, J., and CHARLES E. ORTH, JR., Associate Judge of the Court of Appeals (retired), specially assigned.

*Joseph G. Finnerty, Jr.,* with whom were *Kathleen S. Downs* and *Joel A. Dewey* on the brief, for appellant General Motors Corporation. *L. Vernon Miller, Jr.,* with whom were *Rouse, Underwood & Miller* on the brief, for appellant Howard L. Seidel. *Benjamin R. Goertemiller, Norman E. Parker, Jr.,* and *Semmes, Bowen & Semmes* on the brief, for appellant Gladding Chevrolet, Inc.

*Michael L. Wilsman,* with whom were *Donald C. Allen* and *Allen, Thieblot & Alexander* on the brief, for appellees.

GILBERT, C. J., delivered the opinion of the Court.

This appeal is concerned with an accommodating bailiff who, without the knowledge of the trial judge or trial counsel, supplied a dictionary to the jury, thus contaminating it. The judge declined to order a new trial as a result of the bailiff's pollution of the jury. The trial court did, however, reduce the verdict from $1,630, 284 to slightly less than half, $762,784. Obviously unsatisfied, the appellants, General Motors Corporation (GMC), Gladding Chevrolet, Inc., (Gladding), and Howard L. Seidel (Seidel) have appealed.

## —THE FACTS—

On April 13, 1979, Violet Seidel, accompanied by her husband, the appellant, Howard Seidel, drove their 1978 Chevrolet Monte Carlo to the Montgomery Ward Store in the Glen Burnie shopping center on Ritchie Highway. According to the testimony, Mrs. Seidel stopped the car parallel to the sidewalk in front of the store. She alit from the vehicle and walked toward the store. At the same time, Mrs. Lynda Wernsing, the principal appellee,[1] was standing in the same

---

1. Other appellees include Mrs. Wernsing's husband, son, and daughter.

lane of traffic, approximately two car lengths ahead of the Seidel vehicle. Mrs. Wernsing was in the process of loading packages in the rear compartment of her Chevrolet Suburban. Howard Seidel slid across the seat when his wife left the car, and he assumed the driver's position behind the steering wheel. Seidel moved the gear shift lever from "Park" to "Drive." Several witnesses testified to a loud noise coming from the Seidel automobile. The Monte Carlo moved forward and pinned Mrs. Wernsing against the rear of her vehicle. Seidel reversed the Monte Carlo, and backed away from Mrs. Wernsing, who fell to the street. Seidel's vehicle then again moved forward where it rolled over Mrs. Wernsing. Seidel once more reversed and proceeded backward until he struck another car. The Monte Carlo, with Mr. Seidel still at the wheel, then proceeded forward past Mrs. Wernsing and halted several yards away. Although there was an odor of alcohol on Seidel's breath, and he admitted to having had several drinks at a club, he was not charged with operating under the influence or driving while impaired.

It was alleged that the Monte Carlo had a defective cruise control. Expert testimony differed as to whether the cruise control was in fact defective.

In any event, Mrs. Wernsing and the other appellees sued Seidel, GMC, and Gladding.

### —THE ISSUE—

The appellants-cross-appellees have raised several issues for our review, while the appellees-cross-appellants assail the remittitur and seek to have the total amount of the jury's verdict reinstated. As we see it, however, the only matter we need address is that of whether the trial judge, under the peculiar circumstances of this case, abused his discretion in not granting a new trial.

### —The Dictionary as a Forbidden Book—

Maryland Rule 558 is concerned with the documents, pleadings, prayers, and instructions that may be taken to

the jury room for the jury's consideration during its deliberative phase. The rule provides:

"a. *In Court's Discretion.*

Upon retiring for deliberation, the jury may take with them into the jury room such of the pleadings, granted prayers or written instructions, and exhibits which have been received in evidence, as the court may deem necessary for a proper consideration of the case.

b. *As of Right — Notes.*

The jury may also take with them notes of the testimony or other proceedings taken by themselves but none taken by any other person.

c. *Return to Clerk.*

All such papers or exhibits, except the notes mentioned in section b hereof, shall be returned to the clerk before the jury is discharged.

d. *Exception.*

A deposition may not be taken into the jury room, except by agreement of all parties and with consent of the court."

The jury also takes with it the verbal instructions given to them by the trial judge. Hopefully, those instructions are free of ambiguity and are understandable. In the instant case, the judge told the jury:

"There may be more than one cause of an injury, that is, several negligent acts may work together. Each person whose negligent act is a cause of an injury is responsible. You are instructed that there may be more than one *proximate cause* of an accident and while negligence of a defendant must be a *proximate cause* in order to warrant recovery, it need not necessarily be the sole *proximate cause* of an accident. The mere happening of the accident raises no presumption of negligence on the part of anyone and the burden of proof is upon the plain-

tiffs to prove, by a fair preponderance of affirmative evidence satisfactory to you, that a defendant was guilty of negligence and that such negligence was a direct and *proximate cause* of the accident." (Emphasis supplied.)

The case was submitted to the jury on several issues, among which was number 2. It read:

"Was the Seidel car in a defective condition and unreasonably dangerous at the time of the accident thereby proximately causing the accident?"

A jury that does not comprehend an instruction or portion thereof is free to request the trial judge to clarify that point. Indeed, the trial judge is the only proper source from which a jury may obtain instructions as to the law or the definition of legal terms.

In the case *sub judice,* the jury sent a note to the judge which read:

"We are hung on #2

Can we have a clarification on question #2?

I.E. *proximately"*

Directly under what we were informed is the handwritten message from the jury's foreman, the trial judge wrote:

"rec'd 2:00 PM

10/23/81

Proximate cause is legal cause

E Lerner

Judge"

That terse definition was technically correct but not very informative to lay persons.[2]

---

**2.** Professor Prosser, in his *Handbook of the Law of Torts,* (4th ed. 1971) § 41, states:

"An essential element of the plaintiff's cause of action for negli-

Apparently not satisfied with the definition it received from the trial judge, the jury undertook to educate itself as to what "legal cause" meant. It requested the bailiff, whose job it was to safeguard the jury from contamination by outside influences, to obtain a dictionary for the jury's use. The obliging bailiff [3] located a dictionary [4] and presented it to the venireman.

On the reverse side of the note containing the judge's definition of "proximate cause" as "legal cause" appears:

"page 482
        Webster's Seventh new Collegiate
        Dictionary
*Legal cause*
        having a formal status derived
        from law often without basis
        in actual fact
                        #1
                        Will Casto"

Our reading of that dictionary discloses that the definition apparently copied by Mr. Casto is point "b" of the second definition of the adjective "legal." No attempt seems to have made to define "legal cause" as distinguished from "legal."

Maryland does not heretofore appear to have had a case of a jury's receiving and using a dictionary without the knowledge and consent of the judge and counsel. [5] Other states,

---

gence, or for that matter any other tort, is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered. This connection usually is dealt with by the courts in terms of what is called 'proximate cause' or 'legal cause.'"

There may be, as Prosser notes, nothing in the law that generates more disagreement than the expressions, "proximate cause" or "legal cause."

"Proximate cause" is, according to Prosser, an unfortunate term. *Id.* § 42.

3. The bailiff's unauthorized acts, no matter how well intended, were inexcusable.

4. Writing in the flyleaf of the dictionary indicates that the book had at one time been in the chambers of Judge Paul T. Pitcher, now deceased, and of Judge W. Harvey Beardmore, now retired. Both of those judges served on the Circuit Court for Anne Arundel County.

5. We have, however, considered a criminal case involving the inadvertent

however, have not been as fortunate. The most recent case of which we are aware is *Alvarez v. People,* 653 P.2d 1127 (Colo. 1982). There, a juror consulted a dictionary in order to ascertain the meaning of the "legal terminology in the court's instructions." The use of the dictionary was not made known until after the trial. One juror acknowledged that she was persuaded that "her doubts were not reasonable" because of "the dictionary definitions." The Colorado Supreme Court held:

> "There can be no question but that a juror's consultation of a dictionary to assist in understanding legal terminology in the court's instruction is improper.
>
> . . . .
> . . . [T]he record amply establishes that the defendant was prejudiced in fact by juror misconduct.
>
> . . . .
>
> The central fact is that the juror who looked up the words was aided by the dictionary definitions in deciding that her doubt was not reasonable. This decision was essential to the defendant's conviction. We hold that this adequately established prejudice resulting from juror misconduct and requires reversal."

The Colorado court went on to observe in a footnote:

> "It is futile to speculate how the juror might have voted without the benefit of dictionary definitions and equally futile to inquire whether the use made of the definitions resulted in a meaning of reasonable doubt consistent with the law. The defendant cannot reasonably be required to resolve these problematic matters as a part of his required showing of prejudice."

---

taking of a copy of *Maryland Criminal Jury Instructions and Commentary* to the jury room. We reversed. Hebb v. State, 44 Md. App. 678, 410 A.2d 622 (1980).

A case strikingly similar to that now before us was decided by the Court of Appeals of Illinois. There, in *Gertz, Administrator v. Bass,* 59 Ill. App. 2d 180, 208 N.E.2d 113 (1965), a bailiff had, without the knowledge of the judge or counsel, supplied a Webster's New Collegiate Dictionary to a jury. The Illinois intermediate court held that the trial court erred in not granting a motion for a new trial in light of the jury's use of the dictionary. The court said:

> "We believe that it was prejudicial error for an officer of the court to give to the jury a dictionary which was not admitted into evidence, because the dictionary contained definitions of terms which were essential to a decision in the case, and which were substantially different from the technical legal definitions of those terms which the jury was properly instructed to apply in arriving at their verdict." 59 Ill. App. 2d at 115.

A number of other courts have reached homologous results when confronted with situations involving defiling of a jury. *See e.g., Nichols v. Seaboard Coastline Railway Co.,* 341 So.2d 671 (Ala. 1976) (use by a jury of an encyclopedia to define negligence, contributory negligence, subsequent negligence, etc.); *Application of Phelan,* 126 N.J.L. 410, 19 A.2d 792 (1941) (use of a dictionary to define "undue influence"); *In re Collins' Will,* 18 N.J. Misc. 492, 15 A.2d 98 (1940) (the constable in attendance to the jury obtained and furnished to the jury panel a dictionary in order that they could ascertain the meaning of "undue influence"); *Figula v. Fort Worth & Denver City Railroad Co.,* 131 S.W.2d 998 (Tex. Civ. App. 1939) (foreman of jury consulted a dictionary in order "to ascertain the meaning of 'proximate cause' "); *Palestroni v. Jacobs,* 10 N.J. Super. 266, 77 A.2d 183 (1950) (trial judge "supplied jurors with a dictionary at their request while they were deliberating." The judge, however, did not advise counsel of the communication with the jury.); *Norris Brothers, Inc. v. Mattinson,* 118 S.W.2d 460 (Tex. Civ. App. 1938) (juror used dictionary to determine meaning of the words "immediately prior to the collision"); *Smith v.*

*State,* 95 So.2d 525 (Fla. 1957) (trial judge furnished dictionary to the jury "out of the presence of the defendant and without knowledge of her counsel"); *Gulf States Equipment Co. v. Toombs,* 288 S.W.2d 203 (Tex. Civ. App. 1956) (jury foreman used dictionary to find meaning of "estoppel" and communicated his findings to other jurors).

There is not, however, an unanimity of opinion on the subject of jurors' unauthorized resorting to the dictionary in order to determine the meaning of words or phrases. The Supreme Court of Wyoming, in *Zanetti Bus Lines, Inc. v. Logan,* 400 P.2d 482 (Wyo. 1965) rejected the contention that a bailiff's impermissive supplying of a dictionary to a jury in order that the veniremen might define "natural" was reversible. The court reasoned that there were eight definitions of the word "natural" in that particular dictionary, but that only one of them "could be reasonably applied" to the facts of the case. Moreover, the court said there was "sufficient substantial evidence both of negligence and of proximate cause upon which the jury could have based its verdict." *Id.* at 489.

The Court of Appeals of Oregon, in *State v. Cummings,* 33 Or. App. 265, 576 P.2d 36 (1978), turned aside an argument that a bailiff's giving a dictionary to a jury in order that it might look up the meaning of "tumultuous" was error. The court said that " 'tumultuous' is not a word of art," and that "any error in the jury's reading of . . . [the] definition was harmless. . . ."

Indiana courts had also opted for the "harmless error" solution to the jury's use of a dictionary when "the evidence of the defendant's guilt is overwhelming" and "no explanation . . . [was] offered as to [the jury's] . . . use [of the dictionary]." *Shultz v. State,* 421 N.E.2d 22 (1981). Earlier in *Shultz v. State,* 417 N.E.2d 1127 (1981), the court observed that the so-called "majority rule" is "that prejudice to the complaining party is not presumed but must affirmatively appear in order to require or justify a reversal or a new trial. . . ." *Id. See also* 54 A.L.R.2d 738-39.

A rule requiring a showing of substantial prejudice has been adopted by several of our sister states. For example, in *Kettler v. Phillips,* 191 Kan. 486, 382 P.2d 478 (1963), a juror used a dictionary to "look up" the word "negligence," as well as other words. He read his notes to the jury *after* it had reached its verdict but before it returned to the courtroom. The record did not, in the Kansas court's view, "establish with any definiteness" that the dictionary definition of negligence "was used in arriving at a verdict. The most that can be said is that the dictionary definition *might* have influenced the jury." (Emphasis supplied.) The court concluded that the appellant had not shown that "substantial rights" had "been prejudiced."

Sixteen years later, in *State v. Duncan,* 3 Kan. App. 2d 271, 593 P.2d 427 (1979), the Kansas Court of Appeals held that a jury's "alleged" use of a dictionary to define "assault" was not error in the light of the defendant's inability "to show the existence of substantial prejudice to his rights." Additionally, the court noted that "evidence of defendant's guilt of aggravated assault . . . was overwhelming. . . ."

Iowa, in *In the Matter of the Estate of Cory v. Ankeny State Bank,* 169 N.W.2d 837 (1969), observed that courts generally hold "that prejudice to the complaining party is not presumed but must affirmatively appear in order to require or justify a reversal or a new trial. . . ."

The State of Missouri, in *State v. Suschank,* 595 S.W.2d 295 (1979) commented that only a few states follow a *per se* rule with respect to use by a jury of an unauthorized dictionary. Usually, the courts require that the party attacking the jury's verdict on that ground demonstrate that substantial rights have been prejudiced.

The distillation of what other state courts hold may in our view be fairly stated as: With the exception of a few states, the courts generally agree that if a dictionary is obtained and used by the jury without the knowledge or consent of the trial judge and of trial counsel, the party assailing the use of the dictionary by the jury carries the burden of showing that the

jury's verdict was influenced by the use of the dictionary, and that the rights of the party have been substantially infringed upon to the point that the party has been denied a fair trial.

Patently, such a rule requires a case-by-case consideration inasmuch as not every extraneous-matter verdict need be nullified. Some complainants will be unable to prove prejudice amounting to a denial of substantial rights. *See Nichols v. Seaboard Coastline Railroad Co., supra,* 341 So.2d at 674.

Having that rule firmly in mind, we now examine what, if any, effect the use of the unauthorized dictionary had in the instant case.

The part-time bailiff[6] testified that:

> "[The jury] knocked on the door and I . . . they said they wanted a dictionary. I closed the door. I called the bailiff supervisor and asked for a dictionary. I said, 'The jury wishes a dictionary.' And a dictionary was brought down to me by one of the other Bailiffs. I handed it to the Foreman of the . . . knocked on the door, handed it to the Foreman of the jury, and I said 'I would like to have it back when you're finished' and later on the dictionary was given back to me and that's that."

The bailiff did not tell the judge or counsel of the jury's desire for a dictionary, nor did he advise them that he had supplied the jury with a dictionary. He did, however, tell the clerk "afterwards."

Although the bailiff could not remember receiving a note from the jury foreman with regard to the dictionary, he did recall the verbal request.

---

**6.** The term "bailiff" is one that is applied to those whose special duty is that of guarding or protecting juries from improper communications or intrusions during their deliberations. *See* Nicholson v. State, 38 Fla. 99, 20 So. 818 (1896).

Bailiffs can communicate with the jury if such communications are not prejudicial to the accused, or they do not coerce the jury.

As custodian of the jury, a bailiff is under a duty to communicate requests made by the jury to the trial judge; he does not have the power or authority to answer or refuse the same, and an assumption of such power is improper. Wittmeier v. Post, 78 S.D. 520, 105 N.W.2d 65 (1960).

Four jurors submitted affidavits to the effect that the dictionary definition of "legal" resolved the matter in their minds. The jury seemingly decided that "proximate cause" meant "could it be possible."

We find it hard to believe that such an approach to an issue as "could it be possible" would, absent a law of physics or mathematical certainty to the contrary, result in any other answer than "yes."

The bailiff's testimony, coupled with the affidavits of the four jurors clearly demonstrated substantial prejudice to the appellants.

We are confronted in this case with a clash of two principles:

1. A juror may not impeach his or her own verdict,

and

2. Each litigant is entitled to a fair trial.

The principles seemingly meet here in a head-on collision. Yet, closer examination will reveal that all is not what it appears to be. The four jurors did not launch the invasion of their own verdict. The beachhead was established through the testimony of the errant bailiff; the four jurors served solely as support troops, verifying the breach of the jury's sequestration via the introduction of the dictionary as well as that book's effect on the ultimate outcome.

Ordinarily a juror or jury is not allowed to impeach his, her, or their verdict. Circumstances do arise, however, as in the instant matter, when to permit a verdict to stand in the face of clear contamination of the jury and manifest misinterpretation of legal terminology would be an unconscionable denial of the appellant's right to a fair trial.

The trial judge should have granted the motion for a new trial. His failure to so do was an abuse of discretion.

Ordinarily, under Maryland Rule 1082 a, costs are awarded against the losing party. Here, we deem it appropriate, because of the injection of the dictionary into the jury

process by the bailiff, that costs be allocated among all parties.

> *Judgment reversed.*
> *Case remanded for a new trial.*
> *One-fourth costs to be paid by each appellant and one-fourth by appellees.*