470 A.2d 802

Lynda S. WERNSING et al.

v.

GENERAL MOTORS CORPORATION et al.

No. 38, Sept. Term, 1983.

Court of Appeals of Maryland.

Feb. 3, 1984.

Michael L. Wilsman, Baltimore (Donald C. Allen and Allen, Thieblot & Alexander on brief), Baltimore, for appellants.

Francis B. Burch, Jr., Baltimore (Joseph G. Finnerty, Jr., Joel A. Dewey and Piper & Marbury, on brief), Baltimore, for appellee, General Motors Corp.

L. Vernon Miller, Annapolis (Rouse, Underwood & Miller, on brief), Annapolis, for appellee, Howard L. Seidel.

Benjamin R. Goertemiller, Norman E. Parker, Jr. and Semmes, Bowen & Semmes, Baltimore, on brief, for appellee, Gladding Chevrolet, Inc.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

RODOWSKY, Judge.

In this personal injury action, reported as *General Motors Corp. v. Wernsing,* 54 Md.App. 19, 456 A.2d 939 (1983), the Court of Special Appeals held that the trial court had abused its discretion by denying a new trial sought by defendants because of juror misconduct. A dictionary had been used in connection with deciding proximate causation during jury deliberations. We granted the plaintiffs' petition for certiorari and shall affirm. While, on the facts of this case, we agree that a new trial is required as mandated by the Court of Special Appeals, we do not entirely accept that court's rationale. It departs from settled Maryland law prohibiting a juror from impeaching the jury verdict.

Petitioners are Mrs. Lynda Wernsing and her two children, James and Alexa. General Motors Corporation (GMC), Gladding Chevrolet, Inc. (Gladding) and Howard L. Seidel (Seidel), each of whom was a defendant in the trial court, are respondents. A succinct statement of the facts was given by the intermediate appellate court (*id.* at 20–21, 456 A.2d at 940–41):

> On April 13, 1979, Violet Seidel, accompanied by her husband, the [defendant], Howard Seidel, drove their 1978 Chevrolet Monte Carlo to the Montgomery Ward Store in the Glen Burnie shopping center on Ritchie Highway. According to the testimony, Mrs. Seidel stopped the car parallel to the sidewalk in front of the store. She alit from the vehicle and walked toward the store. At the same time, Mrs. Lynda Wernsing, the principal [plaintiff], was standing in the same lane of traffic, approximately two car lengths ahead of the Seidel vehicle. Mrs. Wernsing was in the process of loading packages in the rear compartment of her Chevrolet Suburban. Howard Seidel slid across the seat when his wife left the car, and he assumed the driver's position behind the steering wheel. Seidel moved the gear shift lever from "Park" to "Drive." Several witnesses testified to a loud noise coming from the Seidel automobile. The Monte Carlo moved forward and pinned Mrs. Wernsing against the rear of her vehicle.

Seidel reversed the Monte Carlo, and backed away from Mrs. Wernsing, who fell to the street. Seidel's vehicle then again moved forward where it rolled over Mrs. Wernsing. Seidel once more reversed and proceeded backward until he struck another car. The Monte Carlo, with Mr. Seidel still at the wheel, then proceeded forward past Mrs. Wernsing and halted several yards away. Although there was an odor of alcohol on Seidel's breath, and he admitted to having had several drinks at a club, he was not charged with operating under the influence or driving while impaired.

It was alleged that the Monte Carlo had a defective cruise control. Expert testimony differed as to whether the cruise control was in fact defective. [Footnote omitted.]

GMC's and Gladding's positions were that there was no defect at the time of the accident and that Seidel's negligent operation of the Monte Carlo caused it to strike Mrs. Wernsing. Seidel's position was that he did nothing wrong and that the accident was caused by a defective cruise control. Plaintiffs stressed that the cruise control was defective when the car was sold to Seidel. Determining proximate cause was the core of the jury's function on these liability issues.

The case was submitted on special interrogatories. They included the following, each of which the jury answered "yes."

1. Was the accident proximately caused by any negligence on the part of Howard Seidel?

2. Was the Seidel car in a defective condition and unreasonably dangerous at the time of the accident thereby proximately causing the accident?

3. (Answer only if your answer to No. 2 is "yes".) Was the unreasonably dangerous condition present in the Seidel car at the time the car was sold to Mr. Seidel?

In its charge the trial court included this passage:

To recover[,] the negligence must be a cause of an injury. There may be more than one cause of an injury, that is, several negligent acts may work together. Each person whose negligent act is a cause of an injury is responsible. You are instructed that there may be more than one proximate cause of an accident and while negligence of a defendant must be a proximate cause in order to warrant recovery, it need not necessarily be the sole proximate cause of an accident. The mere happening of the accident raises no presumption of negligence on the part of anyone and the burden of proof is upon the plaintiffs to prove . . . that a defendant was guilty of negligence and that such negligence was a direct and proximate cause of the accident.

Concerning strict liability in tort, the jury was instructed that the plaintiffs must prove, *inter alia,* that the Monte Carlo was in an unreasonably dangerous condition when sold and "that the defective condition was a proximate cause of the accident."

Verdicts were rendered of $1,600,000 to Mrs. Wernsing, $15,000 to James and $15,000 to Alexa against GMC, Gladding and Seidel, jointly. Respondents moved for a new trial and alternatively for remittiturs. The circuit court denied an unconditional new trial but did order a new trial unless remittiturs were accepted. Petitioners agreed to the reductions, and judgments were entered in favor of Mrs. Wernsing for $750,000, of James for $7,500 and of Alexa for $5,000.

On this petition we are concerned with the intermediate appellate court's remand for a new trial due to juror misconduct. Because petitioners contend that the Court of Special Appeals improperly considered evidence by which jurors impeached their verdict, we first consider the proof of the claimed misconduct.

(1)

At the hearing on the motion for a new trial evidence that a dictionary had been utilized in jury deliberations consisted of (1) jurors' affidavits, (2) a bystander's affidavit, (3) testi-

mony of the court bailiff, and (4) certain writings made contemporaneously with the jury's deliberations. Attached to GMC's new trial motion were affidavits from four jurors. Each made oath that the foreman had obtained a dictionary, read to the jury from it, and caused the particular affiant to change from a "no" to a "yes" vote on issue 2. While there were variations between these affidavits, three of them said the foreman had read the definitions of "proximate," "proximately" and/or "legal." These four jurors swore that, as a result, they believed their task was to decide if it were *possible* that the Monte Carlo caused the accident, or was defective. The bystander's affidavit stated that she was part of a group, including the foreman and two other jurors, who were conversing after the verdict had been returned. She said the foreman stated that he had been able to obtain unanimity on question 2 by reading dictionary definitions to his colleagues.

 The Court of Special Appeals relied upon this evidence in remanding for a new trial.[1] Petitioners correctly point out that consideration of these affidavits was impermissible. As recently as *Oxtoby v. McGowan,* 294 Md. 83, 101, 447 A.2d 860, 870 (1982) we reiterated the well-settled Maryland rule that a juror cannot be heard to impeach his verdict. In that medical malpractice case we excluded from consideration juror affidavits that a medical book had been brought into the jury room and examined by some of the panel. The post-verdict affidavits in the instant case are a

---

1. Specifically the intermediate appellate court stated:

 Four jurors submitted affidavits to the effect that the dictionary definition of "legal" resolved the matter in their minds. The jury seemingly decided that "proximate cause" meant "could it be possible."

 We find it hard to believe that such an approach to an issue as "could it be possible" would, absent a law of physics or mathematical certainty to the contrary, result in any other answer than "yes."

 The bailiff's testimony, coupled with the affidavits of the four jurors clearly demonstrated substantial prejudice to the appellants. [54 Md.App. at 30, 456 A.2d at 945.]

particularly gross example of soliciting a reconstruction of a juror's mental processes in reaching the verdict. This is precisely the type of attempted undermining of verdict finality which Maryland law does not permit. In addition to *Oxtoby, supra, see Christ v. Wempe,* 219 Md. 627, 641, 150 A.2d 918, 925 (1959); *Williams v. State,* 204 Md. 55, 67–72, 102 A.2d 714, 720–21 (1954); *Kelly v. Huber Baking Co.,* 145 Md. 321, 328, 125 A. 782, 785 (1924); *Brinsfield v. Howeth,* 110 Md. 520, 530–31, 73 A. 289, 294 (1909); *Browne v. Browne,* 22 Md. 103, 113–14 (1864); *Ford v. State,* 12 Md. 514, 546 (1859); *Bosley v. The Chesapeake Insurance Co.,* 3 G & J 450, 473 (1831) (note); *Braun v. Ford Motor Co.,* 32 Md.App. 545, 551–54, 363 A.2d 562, 566–68, *cert. denied,* 278 Md. 716 (1976); *Dixon v. State,* 27 Md.App. 443, 448, 340 A.2d 396, 400, *cert. denied,* 276 Md. 741 (1975); 2 J. Poe, *Pleading and Practice at Law* 329 (H. Tiffany 5th ed. 1925). The affidavit by the participant in the post-verdict conversation between certain jurors attempts to prove the truth of the content of the statements made by the foreman in that conversation. Even if we assume the affidavit is otherwise admissible, it falls within the prohibition described above.

The opinion of the Court of Special Appeals undertook to distinguish the prohibition against verdict impeachment on the ground that the jurors' affidavits in this case merely corroborated the bailiff's testimony.[2] *Oxtoby, supra,* rejected an argument based on substantially the same purported justification for undermining the Maryland rule. That holding was, in turn, based upon *Christ v. Wempe, supra,* which held that proffered testimony of jurors was properly excluded. This was so even though the proffer was directed to a matter in evidence through the affidavit of a court clerk

---

2. On this point the intermediate appellate court said (54 Md.App. at 30, 456 A.2d at 945):

The four jurors did not launch the invasion of their own verdict. The beachhead was established through the testimony of the errant bailiff; the four jurors served solely as support troops, verifying the breach of the jury's sequestration via the introduction of the dictionary as well as that book's effect on the ultimate outcome.

who had described his conversation with the foreperson concerning the relationship between special issues submitted to the jury.

On the other hand, the testimony of the bailiff presents "a different situation" and is competent. *Christ v. Wempe, supra,* 219 Md. at 642, 150 A.2d at 926. Similarly, the jury notes, hereinafter described, are competent proof. As documents generated during the jury's deliberations, they do not suffer the taint of possible post-verdict importuning. Whether respondents have even established that extraneous matter was before the jury must be answered within a framework limited to those two evidence categories.

Jury deliberations commenced sometime on the morning of October 23, 1981. Juror No. 1, Willis W. Casto (Casto), was designated as foreman. During sequestration at least two pieces of paper passed from the jury room to the bailiff. After the verdict was rendered, these were given by the bailiff to the court clerk and retained by the clerk, in an envelope marked "jury notes," until the hearing on the new trial motion. In his testimony at that hearing the bailiff described two events during jury deliberations, but he was uncertain of their sequence. At one point a note was passed from the jury room to the judge. It reads:

> We are hung on # 2
> Can we have a clarification on question # 2?
> IE: proximately [Underscoring in original.]

The reply returned to the jury appears in longhand on the same side of the piece of paper. It reads:

> rec'd 2:00 PM
> 10/23/81
>
> Proximate cause is legal cause
> E. Lerner
> Judge

At another time during jury deliberations Casto asked the bailiff for a dictionary. This was obtained by the bailiff through his supervisor and handed to the foreman. Another

jury note, retained in the clerk's envelope, contains longhand reading:

> We need a Dictionary!
> #1
> Will Casto

The particular dictionary furnished, a copy of Webster's Seventh New Collegiate Dictionary, was identified by the bailiff and admitted into evidence.

On the reverse side of the note signed by the judge there is other longhand which reads:

> page 482
> Webster's Seventh New Collegiate
> Dictionary
>
> Legal cause
> having a formal status
> derived from law often
> without basis in actual
> fact
> #1
> Will Casto

That definition is identical to definition 2 b for "legal" in the dictionary supplied by the bailiff.[3]

In denying a new trial the circuit judge emphasized that he would not permit jurors to overturn their verdicts by post-trial affidavits, because it would create havoc. However, he did not differentiate between the juror affidavits and the other forms of evidence. The issue is whether this record, when consideration is limited to the bailiff's testimony and the jury notes, demonstrates an abuse of discretion in denying the new trial motion.

### (2)

The problem of the effect on proceedings where one or more jurors have consulted a dictionary during deliberations has been presented in a number of decisions in other states. It appears to be the near universal consensus that a new trial is not awarded simply because a dictionary was before

---

**3.** After the jury's verdict had been received, counsel for GMC requested that the jury's note asking for further clarification be retained. Neither the court nor apparently counsel noted any writing on the reverse side of the paper at that time.

the jury. The court must conclude that there was prejudice to the complaining party. *See* Annot., 54 A.L.R.2d 738 (1957). Analysis by other courts, however, diverges in the approach taken to determine whether use of a dictionary was prejudicial. Further complexities arise in analogizing to Maryland from decisions in other states where the verdict impeachment prohibition is not as stringently applied as here.

Some decisions require that the movant for a new trial essentially prove prejudice in fact. In the absence of such a showing, the new trial is denied. *See Dulaney v. Burns,* 218 Ala. 493, 119 So. 21 (1928); *Lane v. Mathews,* 74 Ariz. 201, 245 P.2d 1025, *rev'd on other grounds on reh'g,* 75 Ariz. 1, 251 P.2d 303 (1952); *People v. Jedlicka,* 84 Ill.App.3d 483, 405 N.E.2d 844 (1980); *In re Estate of Cory,* 169 N.W.2d 837 (Iowa 1969); *State v. Duncan,* 3 Kan.App.2d 271, 593 P.2d 427 (1979); *Kaufman v. Miller,* 405 S.W.2d 820 (Tex.Civ.App.1966), *rev'd on other grounds,* 414 S.W.2d 164 (Tex.1967); *Wright v. Clark,* 50 Vt. 130 (1877); *Rocky Mountain Trucking Co. v. Taylor,* 79 Wyo. 461, 335 P.2d 448 (1959). In their brief to this Court petitioners have emphasized *Rocky Mountain Trucking Co. v. Taylor, supra.* Wyoming, like Maryland, will not consider juror affidavits offered to impeach the verdict. The result in *Rocky Mountain Trucking* was that the only competent proof showed that the bailiff had furnished a dictionary to the jury but there was no proof as to any use made of the dictionary during deliberations. Here, on the other hand, the respondents' competent proof goes beyond the mere request for and presence of a dictionary in the jury room.

Other courts have presumed prejudice based solely on use of a dictionary during jury deliberations, with the burden on the adversary to rebut. Under these cases the court may conclude that there is prejudice without proof of the purpose for which the book was consulted. *See Grissinger v. Griffin,* 186 So.2d 58 (Fla.Dist.Ct.App.1966) (judgment reversed and case remanded for new trial); *Daniels v. Barker,* 89 N.H. 416, 200 A. 410 (1938) (same); and *State v. Holmes,* 17

Or.App. 464, 522 P.2d 900 (1974) (same). In *State v. Holt,* 79 S.D. 50, 107 N.W.2d 732 (1961) the court presumed prejudice from the jurors' use of a dictionary to look up the words, "corporal," "assault" and "battery," but agreed with the trial judge that the presumption had been overcome because affidavits from all twelve jurors stated that the definitions did not influence them in arriving at their verdict.

We reject the rule which presumes prejudice solely from delivery of a dictionary into the jury room without the consent of the court and all parties. The result of such a rule in Maryland would be to overturn verdicts automatically in nearly all cases where this irregularity occurs. The reason is that the party opposing a new trial would almost never be able to demonstrate the absence of harm from the presence in the jury room of the extraneous material, because jurors may not be interrogated concerning their deliberations in order to impeach the verdict. It is true that some courts permit juror affidavits for the purpose of sustaining a verdict; but that is not Maryland practice. If the lid on this can of worms is partially lifted to allow juror interrogation to sustain the verdict, the party opposing a new trial should not be limited to resting exclusively on a presumption. The opponent should also be able to seek countervailing affidavits from other jurors or to insist upon live testimony and cross-examination. Either approach is contrary to Maryland policy.

Further, a presumption of prejudice from the unauthorized presence of a dictionary is inconsistent with the rule we apply when, in the course of trial and before the jury retires, it is learned that a juror has received information concerning the case from a source outside of the record. In those circumstances prejudice is not presumed; rather the test is "whether the conversations were 'of such a nature that their effect must fairly be held to have been to deprive the injured party of a fair and impartial trial.' " *Safeway Trails, Inc. v. Smith,* 222 Md. 206, 217, 159 A.2d 823, 829 (1960), quoting *Rent-A-Car Co. v. Globe & Rutgers Fire Insurance Co.,* 163 Md. 401, 409, 163 A. 702, 705 (1933). And

*see Joseph F. Hughes & Co. v. Stockhausen,* 212 Md. 559, 129 A.2d 844 (1957).

Frequently in these "dictionary cases" the record reflects what definitions a juror or jury considered. When that is known, one factor which bears significantly on prejudice is how the definitions derived from the dictionary compare with the meanings of the same terms as used in the instructions to the jury by the trial court. In *Dongo v. Banks,* 448 A.2d 885 (Me.1982) no error was found in the award of a new trial where the jury had referred to a legally incorrect definition of "proximate" in a dictionary. Indeed, the appellate court said that the trial judge "could hardly have done otherwise" than grant the new trial. *Id.* at 889. "Proximate" was also involved in *Banaszek v. F. Mayer Boot & Shoe Co.,* 155 Wis. 127, 143 N.W. 1062 (1913). Because of the difference between the dictionary and legal definitions the grant of a new trial was undisturbed, despite affidavits from eleven jurors, comprising all who could be found, that they had not been influenced by the dictionary. A jury's unauthorized use of a dictionary to learn the meaning of "undue" has resulted in a new trial when those definitions were "too broad and inappropriate to be applied to the evidence." *See In re Collins' Will,* 18 N.J.Misc. 492, 496, 15 A.2d 98, 101 (1940), *cert. denied sub nom., Application of Phelan,* 126 N.J.L. 410, 19 A.2d 792 (1941). Other cases have sustained the denial of a new trial, in part because of the lack of any significant difference between the dictionary definition and the meaning intended in the judge's instructions. *See State v. Amorin,* 58 Haw. 623, 574 P.2d 895 (1978); *Pulkrabek v. Lampe,* 179 Kan. 204, 293 P.2d 998 (1956); *Dutton v. Southern Pacific Transportation,* 561 S.W.2d 892 (Tex.Civ.App.), *rev'd on other grounds,* 576 S.W.2d 782 (Tex.1978); *Wilson v. State,* 495 S.W.2d 927 (Tex.Cr.App.1973); *State v. Donald,* 90 Utah 533, 63 P.2d 246 (1936); *Zanetti Bus Lines, Inc. v. Logan,* 400 P.2d 482 (Wyo.1965).

In the matter *sub judice* there is a very substantial difference between the trial judge's use of "legal cause" as

synonymous with proximate cause and the dictionary definition copied by Casto. Petitioners, however, argue that the Casto notation fails to prove prejudice, particularly because its effect, if any, on any juror is unknown, once the affidavits have been excluded from consideration. In effect petitioners urge that prejudice can only be shown by demonstrating that one or more jurors were in fact influenced by legally incorrect matter found in a dictionary. As a practical matter, meeting such a standard would seem to be impossible because, in Maryland, direct evidence of the effect of the extraneous material on any juror's decision could not be presented to upset the verdict. *Cf. Alvarez v. People,* 653 P.2d 1127 (Colo.1982) (reversal and remand for new trial where affidavits of two jurors disclosed that they concluded their doubts were not reasonable after consulting dictionary for definition of "reasonable").

We therefore look to the decisions of those courts which prohibit impeachment. *Gertz v. Bass,* 59 Ill.App.2d 180, 208 N.E.2d 113 (1965) bears similarities to the case before us. Because Illinois law precludes jurors' affidavits, the only competent evidence in that case showed that the jury had requested and received a dictionary which was later made an exhibit on the new trial motion. Comparison of key terms in the court's charge, involving a guest statute, with those terms as defined in the dictionary reflected substantial differences and consequently a potential for prejudice. In remanding for a new trial the court addressed the unknown use made of the dictionary.

> It is reasonable to infer from the fact that the jury specifically requested the dictionary, that they made use of the volume in determining the meaning of the crucial terms and were influenced thereby to the prejudice of the plaintiffs. [*Id.* at 185, 208 N.E.2d at 116.]

The instant case presents a more specific record because the Casto memorandum shows the precise term from the instructions ("legal cause") for which the dictionary was used. Here, without considering juror affidavits, we know (1) that a dictionary was requested and received by the jury;

(2) the particular dictionary supplied; (3) that it was used by at least one juror; and (4) the particular definition considered by that juror. The happenstance of the Casto memorandum makes the record before us comparable to the record in a state which permits jurors to describe extraneous matter brought into the jury room but which prohibits describing its effect on deliberations. Such a case is *Palestroni v. Jacobs,* 10 N.J.Super. 266, 77 A.2d 183 (1950), a suit on a building contract. If jurors' mental processes were excluded, the record showed that a dictionary had been consulted to ascertain the definition of a word in the specifications. The court, through an opinion by then New Jersey Superior Court Judge William Brennan, held that

> the test whether a new trial will be granted is whether the extraneous matter could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge. If the extraneous matter has that tendency on the face of it, a new trial should be granted without further inquiry as to its actual effect. [*Id.* at 271, 77 A.2d at 185.]

There was a remand for a new trial.

Similar is *State v. Ott,* 111 Wis.2d 691, 331 N.W.2d 629 (Wis.App.1983). One juror had brought into the deliberations a definition of "depraved," but the record did not contain the exact dictionary definition used. After matching the definition used in the court's charge against those contained in a number of standard dictionaries, the court concluded that the dictionary definitions were significantly broader than the technical meaning embodied in the instructions. Because "the probable effect upon a hypothetical average jury would be prejudicial," there was a remand for a new trial. *Id.* at 696, 331 N.W.2d at 632.

■ The Court of Special Appeals clearly identified the problem in the instant case. It is to balance the right to a fair trial with the policy prohibiting impeachment by a juror of the verdict. Where, as here, the precise extraneous matter is known but direct evidence as to its effect on the

deliberations is not permitted, a sound balance is struck by a rule which looks to the probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case. It is the function of the trial judge when ruling on a motion for a new trial to evaluate the degree of probable prejudice and whether it justifies a new trial. That judgment will not be disturbed but for an abuse of discretion.

■ Under the unusual facts of the case at bar, we hold that there was an abuse of discretion. This was a trial in which the jury's findings concerning proximate cause controlled the major liability issues. By his note to the jury the trial judge had equated proximate cause with legal cause. In consulting the dictionary definition of "legal," Casto was sufficiently impressed with definition 2 b to write it out in longhand. Casto's memo reflects that he transposed that secondary definition of "legal" to "Legal cause," thereby including in legal (proximate) cause the element: "often without basis in actual fact." If this approach to proximate cause were in fact applied by the jury, or even by Casto alone, it would mean that all of the evidence, including expert opinions, in this protracted and complex products liability case would have been disregarded. That degree of probable prejudice is so great that it was an abuse of discretion to deny a new trial.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT TO BE PAID BY THE PETITIONERS.